(No. 13975.—Decree affirmed.)

ELI GROVER HOLLER, Appellant, *vs.* TAMZIN HOLLER *et al.* Appellees.

*Opinion filed June 22, 1921.*

1. WILLS—*testator is presumed to have destroyed will if it can not be found after his death.* Where a will and codicil were placed by a testator in a certain box where he kept his papers and to which he had access and they cannot be found there or elsewhere after his death, there is a presumption that he destroyed them with the intention of revoking his will.

2. SAME—*declarations of a testator after execution of will are admissible on question of revocation in event of loss of will.* The declarations of a testator after the execution of his will are admissible, in the event of its loss, to show that it had not been canceled, and under the same circumstances they are admissible to show that the loss or destruction of the will was in accordance with the testator's purpose.

3. SAME—*when there is no presumption that will was destroyed after death of testator.* The law will not presume the commission of a crime merely because there is an opportunity, or even a motive, to commit the offense where the circumstances are equally consistent with innocence, and in a proceeding to probate a copy of an alleged lost will there can be no basis for the conclusion that the will was destroyed after the death of the testator, where it is not shown that it was in existence when he died.

4. SAME—*when evidence of contents of prior will is not admissible.* In a proceeding to probate a copy of an alleged lost will,

evidence of the contents of a prior will to prove that it was substantially the same as the lost will is not admissible, as the existence of the prior will can throw no light on the question whether the subsequent will was revoked.

5. SAME—*what evidence is admissible in rebuttal on question whether lost will was revoked—prejudicial error.* In a proceeding to probate a copy of an alleged lost will, where the parties contesting the probate introduce evidence to show that the land given to one devisee was of much more value than that given to others and that the testator may have destroyed the will because of such inequality, the proponents should be allowed to introduce evidence in rebuttal as to the value of said land; but the sustaining of an objection to the rebuttal evidence is not prejudicial error where the inequality of the will is admitted, the evidence being merely as to the degree of inequality.

APPEAL from the Circuit Court of McDonough county; the Hon. HARRY M. WAGGONER, Judge, presiding.

GEORGE V. HELFRICH, CHARLES J. SCOFIELD, and J. PAUL CALIFF, for appellant.

LAWYER & HAINLINE, for appellee Tamzin Holler.

Mr. JUSTICE DUNN delivered the opinion of the court:

Eli Holler, of the village of Bardolph, in McDonough county, who died May 1, 1920, had executed a will on May 6, 1919, and later two codicils, but they were not found after his death, and U. G. Smith was appointed administrator of his estate. His wife, Tamzin, survived him, and his heirs were his son, the appellant, Eli Grover Holler, and eight daughters, one daughter who was living at the time the will was executed having died in January, 1920, in her father's lifetime. All of his children were married and living in homes of their own except his daughter Ruth, who lived with her father and mother in their home. On September 10, 1920, the son filed a petition in the county court for the probate of the will and codicils, alleging that they had been lost or destroyed but not by the act or agency of the testator, and setting out what he averred to be sub-

stantial copies of them. The cause was heard and probate was denied. Another hearing on appeal to the circuit court resulted in a similar order, and another appeal by the petitioner to this court.

The errors assigned and argued relate almost entirely to questions of fact and the sufficiency of the evidence, though two rulings of the court on the admission of evidence are complained of.

The estate, amounting to over $100,000, consisted of about 410 acres of land, the homestead in Bardolph and personal property of the value of $15,000, and there were no debts of any considerable amount. The will gave to the widow absolutely the household goods and $500 in cash, together with the interest on $1700 of Liberty bonds during her lifetime, and also devised to her for life the homestead, consisting of six lots in the village of Bardolph, with power to sell two of the lots and use the proceeds of the sale, and with directions that the remainder of the residence property should be sold at her death and the proceeds equally divided among the children. It also devised to her 80 acres of land for life, provided that she should rent the land to her son, Grover, as long as he should desire it, charging him no more rent than similar land would rent for in the neighborhood. There were devised to the son for life 80 acres of land and the remainder in the 80 acres devised to his mother, Tamzin Holler, with remainder to Grover's children, provided that he should pay, within six months after the death of his mother, $5000 to his sisters. The rest of the testator's land was devised to his daughters equally, with a provision that if any of them should die before coming into possession of the property devised to her the children of such deceased daughter should receive the share of the mother, and in case of death leaving no descendant the share of the daughter so dying should be divided equally among the living daughters. The testator's interest in the estate of his father was devised in equal

shares to his wife and children. The will devised to the children of the testator's brother, Nelson H. Holler, all of his interest in a certain tract of 80 acres of land upon the condition that his brother should not bring any proceeding to contest the will of his father or object to or interfere with the final settlement of the father's estate. In the event that the testator's widow should become incompetent to transact business and care for her property, the will appointed the son, Grover, trustee, to take charge of and manage the property and pay over to her as much money as would be needed to properly and comfortably care for her during her lifetime, with the provision that he should not be required to give any bond or make any accounting or report to any court or any other person. The personal property was directed to be equally divided among the children. The will contained a provision that none of the children should in any manner contest the will, and in case any of them did so, the will gave to such one or more five dollars instead of the respective provisions made by the will. The widow was named as executrix without bond, and it was provided that she should not make any report of her acts to any court, and it was further directed that she should be assisted by the son, and he should not be required to give bond or make any report to the court.

The execution of the will and codicils was proved by the attesting witnesses, and the contents of the will and the second codicil were proved by the testimony of Harry B. Maxwell, a newspaper publisher, who had drawn a previous will executed by the testator in 1907 or 1908 and who drew the will in question. He went to Holler's house on May 5, 1919, in response to the latter's request, and Holler told him that he wanted to make a new will. Holler produced from a tin box the old will, which was sealed up in an envelope, upon which was indorsed, "Last will and testament of Eli Holler." Upon Holler's request Maxwell opened the envelope and read the will aloud. Holler then told Max-

well how he wanted the new will drawn, and Maxwell made a memorandum, which he preserved and produced on the hearing. Holler asked Maxwell what he thought of the way he was making the will. Maxwell answered that he didn't consider it any of his business, but said, "I believe in your place I wouldn't make it so one-sided." Holler said, "They tell me I am one-sided; I just can't help it; if you only have one boy you can't help it; and I got some of the land from my father, and I want my boy, Grover, to have it; I can't help but be that way about it." Mrs. Holler and the daughter Ruth were at the house and Ruth was in and out of the room where her father and Maxwell were, but there was no testimony that she knew in what business they were engaged. Maxwell prepared the will and returned with it the next day. It was then executed in the presence of Maxwell, Conwell D. Fleming, a brother-in-law of the testator, and Dr. Philip W. O. Baer, no other person being present. After the will was executed the testator asked what he should do with the old one, and Maxwell said, "If anything should happen that this new will didn't stick the old one would, probably." Holler said, "It won't do any harm; I will just throw it in here." He put it in the box with the new one. Holler afterward executed a codicil, which was drawn by U. G. Smith and was not dated, though the attestation purported to have been executed "on this ....... day of ........... A. D. 1919." The witnesses were U. G. Smith, who thought it was executed on March 1, 1920, and C. D. Fleming, who was one of the witnesses to the original will and thought it was executed late in November or early in December, 1919. This codicil made provision in regard to a tenant house which Grover had built at his own expense on land of the testator, that he should be permitted to leave the house on the premises and remove it when he saw fit on payment of certain rent and taxes, and provided that Grover should not be required to make any report to the court of his acts as trus-

tee under the will but should render a true and correct account to the other heirs.  On March 6, 1920, Maxwell was again sent for and informed that the testator desired to make a second codicil to his will for the purpose of eliminating the requirement of the first codicil that Grover should make a report of his acts to the other heirs.  Maxwell separated the codicil from the will to which it was attached and took it away with him.  It was never returned to the testator and was supposed to be lost or destroyed but shortly before the hearing in the county court was found by Maxwell in the pocket of a coat.  On March 8 Maxwell returned with the second codicil, and it was executed in the presence of Fleming and Maxwell, and together with the will of May 6, 1919, which it expressly ratified and confirmed, was placed in an envelope which was sealed and indorsed, "Last will and testament of Eli Holler," and put in a box in which Holler kept his papers, which was locked and placed on a chair or stool by the side of the bed in which Holler was.  This tin box was kept in a closet, the door of which was about three feet from the head of Holler's bed and swung back into the closet.  The box was kept locked and the key hung on the closet door on the side next the bed-room, about seven feet high.

There was no evidence that anyone saw the will and the second codicil after March 8, when the codicil was executed and the will and codicil were placed in the box. They could not be found there or elsewhere after the testator's death and the presumption therefore arises that he destroyed them with the intention of revoking his will. (*Taylor* v. *Pegram,* 151 Ill. 106; *Stetson* v. *Stetson,* 200 id. 601; *St. Mary's Home* v. *Dodge,* 257 id. 518; *Griffith* v. *Higinbotom,* 262 id. 126.)  This presumption is subject to be rebutted by circumstances tending to show the contrary conclusion, and therefore the question in the case is whether the presumption of revocation is rebutted by circumstances shown by the evidence.  The circumstances on

which the appellant relies as tending to show a contrary conclusion are the fixed intention which the testator is said to have entertained for many years that Grover should have the home farm, which was the 160 acres devised to him, and that it should remain in his family; the absence of any evidence of a change in this intention or of dissatisfaction with the will; the fact that only a short time before his death he stated that the will was in the box; and the physical condition of the testator, which it was claimed was such that it was not reasonably possible that he could himself have destroyed the will without assistance.

It must be conceded that it was the testator's intention that Grover should have the home farm and that all the other provisions of the will should be carried out when he executed the codicil on March 8, for by it he expressly confirmed everything contained in the will. Nevertheless he could change his intention, revoke his will and elect to die intestate if he chose, and from the fact that no will could be found after his death it must be presumed, unless the whole evidence leads to a contrary conclusion, that he did so. He was sixty-nine years old. Dr. Bowen, his attending physician for the last three months of his life, and Alexander Miller, who was his attendant at night during the same time, testified as to his physical condition. Dr. Bowen testified that he was very sick from February 1, when Dr. Bowen began to attend him, and was suffering from dropsy. He was a large man, weighing probably 220 pounds. He was rather emaciated in the shoulders but the rest of his body was bloated. His abdomen was very large,—probably containing two or three gallons of fluid at a time. His legs were much swollen and about a foot thick at the thigh. The first of February he was able to get around unassisted, though he probably had someone help him walk. His condition remained stationary for about a month or six weeks and then gradually grew worse, and tapping was necessary to withdraw the fluid from his abdomen and legs. He grad-

ually grew weaker, and his ability to get around diminished
until he was unable to get around unassisted for the last
month or six weeks of his life. In getting him up from
the bed the assistants,—his daughter Ruth during the day
and Miller at night,—would pull one of his legs out on the
side of the bed and then bring the other out, then get hold
of his hands and raise him up on the side of the bed. He
would then put his hands down and get into a standing
position, partly by his own efforts and partly with assist-
ance. During the first part of the last month of his life
he might have moved a little by steadying himself along
the bed. There might have been times until the last month
of his life when he could even get out of bed without as-
sistance. He had good days and bad days. The tapping
relieved him temporarily. A week before he died he had
a spell of a few good days, when he was stronger, more
like himself and more able to get around.

Miller testified that for the first two months,—from the
last of January,—Holler could help himself a good deal.
He was in bed regularly. Witness got him up in the rock-
ing chair out in the sitting room two or three times. His
legs would first be brought to the edge of the bed and he
would slide off onto his feet. Miller held him under the
right arm and walked with him to the chair and steadied
him into it. It was usually necessary for him to get Hol-
ler up to the stool from two to half a dozen times a night.
He had to use the stool frequently. For this purpose a coal
bucket was used to the time of his death. Miller emptied
it every night three or four times into a barrel. Consider-
able paper was used and emptied out of the coal bucket,—
mostly newspapers. Frequently it taxed the strength of
both to get Holler up again to take him back to bed. One
morning just as Miller got Holler back to a sitting posture
on the edge of the bed Miller was called to breakfast and
Holler asked to be left as he was. When Miller returned,
about ten minutes later, Holler was back in bed, lying

down. The morning of his death, which occurred about three o'clock, Miller was assisting Holler to get out of his bed when Holler's arm gave way and he fell to the floor and died.

Ruth Holler, who has since married, was living at her father's house during all his sickness and assisted in caring for him in the daytime.

Mrs. Gertrude Holler testified that on March 15 she and her husband, Frank Holler, who was a brother of Eli, had a conference with Eli in his bed-room in regard to a report which the two brothers were to make as trustees of their father's estate. She got the tin box from the closet by the direction of Eli and gave it and the key to Eli, who opened it and took out some papers and laid them to one side. He then took out eight dollars in bills and handed them to Frank, telling him to pay them on an acre of ground which Eli occupied as tenant. He then got out his bank book and his administrator's books and handed them to Frank, who said, "I don't believe I will need these, Eli; you haven't done anything this year; I have everything on my books, but I will take your bank book along and have it balanced, so they can see what was paid out and taken in." Eli locked the box and Mrs. Holler put it back in the closet and hung up the keys. As she and her husband started to leave, Eli called Frank back and told him to pull up a chair, saying, "I want to talk to you; I want you to tell me what you think about these wills." Frank said, "I have got one and I have most come to the conclusion to destroy it; the law is good enough for me." Eli said, "Frank, if the law is good enough for you it is good enough for me; I am a changed man and my children are all the same to me; Bob Hamilton never had no will and they never had any trouble." Frank and his wife lived less than a block from Eli and Mrs. Holler saw Eli twice a day and sometimes oftener. About a week after March 15 she returned with the bank book and at Eli's request she again got the box

and key for him.   He put the books seemingly in the bot-
tom of the box and Ruth Holler put the box away again.
Three or four days later Frank was with attorneys mak-
ing a settlement of some kind for himself and Eli and they
wanted Eli's bank book, and Mrs. Holler again went to
Eli's home and he told Ruth to get the box, which she did
and Eli got the book out.   Ruth went out of the room,
and when Mrs. Holler left, the box was open and the con-
tents were on the bed.   Mrs. Holler again took the book
back about a week before Eli died and Ruth again got the
box at Eli's request.   He hunted for a "Gardner" contract
and asked Mrs. Holler if Frank saw anything of that con-
tract when he was down.   When Mrs. Holler left, the box
was still on the bed and Eli was hunting for the contract.
During this visit Eli said, "When I am gone I want my
children to all think the same of me."   Mrs. Holler said,
"The only way is to divide dollar for dollar, and if you
have an extra dollar give it to Tamzin; she has earned it."
Eli said, "Yes, mother wouldn't have done what she done
if she had been a Christian and had her right mind."   In
explanation of this remark it appeared in evidence that
the mother of Frank and Eli had died the previous year
leaving a will, by which she gave to each of her sons and
daughters, and to the children of those who were dead, a
bequest of one dollar and all the residue of her property to
a grand-daughter, Edith Russell Gardner, giving as a rea-
son that the grand-daughter and her husband had at much
sacrifice of their own interests come to the home of the
testatrix to care for her in her old age and she felt that she
should compensate them for their care and sacrifice.   Frank
and Eli were dissatisfied with the will and on November 8,
1919, filed a bill to contest it.   Mrs. Holler further testi-
fied that the week Eli died she and her husband and Eli
and his wife were present, when the following conversation
occurred:   Eli said, "Frank, I will never get to help you
any more."   Frank said, "Yes, you will."   Eli said, "No,

I don't feel that way, but I am not afraid to die; my children are all the same to me." When Eli bade Frank good-by he said, "I won't be here in the morning." Mrs. Holler visited Eli about six o'clock the next morning and said, "Good morning, Eli; and how are you this morning?" Eli answered, "Gert, I am still here; I didn't think I would be, but I have been kept here to suffer for a purpose; I have been too one-sided in the past; I have never had a girl come home and ask for a crust of bread." Frank also testified to the visit on March 15 and the conversation when Eli called him back, and also the conversation later, in which Eli said all his children were the same to him.

Conwell D. Fleming, who was a witness to the will and the two codicils, testified that he was at Eli's house nearly every day and night after Eli became sick; that a week or two after the second codicil was executed Eli said to him, "Connie, what do you think about me putting this will in the bank?" A discussion of the safety of the bank as a place for its deposit followed, and was concluded by Eli saying, "I guess I will just rest it in the box." Several times, Fleming testified, he heard conversations between Grover and his father in which Grover was directed what to do with the will in case of Eli's death. The last of these conversations was three or four days before his death, in which Eli said: "The will is in that box; there is the keys and the box is in there; immediately after I pass away you take them keys and that box and keep them until that will is called for." The cross-examination of this witness developed that his memory of dates was very indefinite. He fixed the time of the last conversation by its relation to the time when he settled with Eli for cutting wood for him. He had been cutting wood for Eli all winter and finished four or five days or a week before his death, and he had nothing more definite by which to fix the date of the settlement than the date when he heard Eli tell Grover about the will. Eli's daughter Ruth testified that on October 2,

1920, she asked Fleming if her father ever told him, right lately before he died, that the will was in the box, and Fleming answered, "No; the last thing I ever knew of that will was in March, when the codicil was made." Testimony was also introduced that on Tuesday evening, May 4, after the funeral, which occurred the day before, Grover, his sister Ruth, Fleming and the widow examined the contents of the tin box. The will was not found, and Grover said it was strange, as his father had told him it was there about three weeks before. There was evidence, also, that in July, 1920, at a meeting of Grover and five of his sisters, he fixed the time as being about three weeks before his father's death. Grover denied this, but in his testimony before the county court with relation to the Tuesday evening following the funeral, he was asked, "That was the time you told Ruth you couldn't understand it?—that your father had told you three weeks before he died that it was in the box?" and answered, "Yes; he told me three weeks before he died the will was in the box."

The night after Eli Holler's death, which was Saturday night, M. H. Creel and John Kille sat in the room with the body. Ellen Faries, a daughter of the testator, and her husband, occupied the adjoining room. Very early in the morning, between three and four o'clock, Faries came into the room and told Creel and Kille they could go home if they wanted to. They left between four and five o'clock. Faries testified that he did not see or take or destroy the will or codicil or any paper and that he did not see the box in which they had been contained. The funeral occurred on Monday, and on Tuesday morning Grover called at the house and said that Maxwell told him to tell mother to get the will, which was there in the tin box, and take it down and have it probated. Mrs. Holler was lying down and not feeling well, and she and Ruth said, "It looks like there is no hurry to talk about wills now so soon." The box was not examined, but an hour or two later Mrs. Holler

and her two daughters, Ruth and Mrs. Faries, got the box, opened it and examined its contents. They did not find any will or codicil and did not destroy any. Grover returned that night and was told of the result of the search. Fleming was there also, and the box was again opened and the contents examined, Grover, Fleming, Ruth and Mrs. Holler being present, and the will was not found.

Eli Holler had the exclusive possession of the will. No one else, so far as the evidence shows, had access to the box except by his direction. Those who surrounded him might by force or stealth have abstracted the box, just as it was physically possible that any of his property might have been stolen, but there was no evidence that anyone handled it except by his direction or in his presence, or that anyone ever handled the contents or knew what was in the box except as he told or showed them. There is no evidence that any one of his daughters knew he had executed a will, much less what its contents were. Grover knew of the execution of the will by his father's statement. Only Maxwell, Smith and Fleming knew of its contents. During the weeks the testator lay helpless he had time to reflect on the disposition he had made of his property and its fairness to all of his nine children. He had regarded it from the beginning as a one-sided will. He told Maxwell, "They tell me I am one-sided." This may have referred to his daughters or to people in general. At any rate he admitted the charge, saying, "I just can't help it; if you only have one boy you can't help it; and I got some of the land from my father, and I want my boy, Grover, to have it; I can't help but be that way about it." So he made his will one-sided because he couldn't help being that way. His mother died and her will was admitted to probate. It was one-sided and Eli was on the outside. He and his brother were so convinced of the unfairness of the will, even though the reason given for its inequality might seem reasonably satisfactory, that they filed a bill to contest it; but

as he lay helpless on his sick-bed he reflected on wills in general, and when his brother called on him on business he asked him what was his opinion of wills, and when Frank said that he had one but he had about concluded to destroy it,—the law was good enough for him,—Eli agreed with the sentiment, saying that if the law was good enough for Frank it was good enough for Eli. He did not then destroy the will but he continued to reflect. In his helplessness he saw his one daughter who had remained at home devoting herself day by day to the filial duty of caring for him, and he may better have appreciated the reason for his mother's will. Later, when Mrs. Gertrude Holler brought back his bank book Eli said to her, "When I am gone I want my children to all think the same of me." What was in his mind at that time? Did he think, in view of his one-sided will, that his daughters would have occasion to think differently of him from his son? His sister-in-law answered him, "The only way is to divide dollar for dollar, and if you have an extra dollar give it to Tamzin; she has earned it." Eli said, "Yes; mother wouldn't have done what she done if she had been a Christian and had her right mind." If that was really his frame of mind, naturally, if he gave it effect, he would revoke his will. And still later, the week he died, he said to his brother, Frank, and Gertrude, Frank's wife, that he was not afraid to die,—his children were all the same to him; and the next morning, when Gertrude returned, he said, "I have been kept here to suffer for a purpose; I have been too one-sided in the past; I have never had a girl come home and ask for a crust of bread." It is not unreasonable to infer that he meant that his daughters had never called on him for help.

The declarations of a testator after the execution of his will are admissible, in the event of its loss, to show that it had not been canceled. (*In the matter of Page,* 118 Ill. 576.) Under the same circumstances they are admissible to show that the loss or destruction was in accordance with

the testator's purpose. The evidence did not show that the testator was physically incapable of destroying the will. It may be admitted it would have been very difficult, if not impossible, for him to have got out of bed and got the box from its place of deposit in the closet, but he frequently had the box in his possession. It was brought to him by any of the family who happened to be present when he requested it. He had it several times on the bed, opened, with the papers out of it, after the 15th of March. None of the parties, if they had seen him take the will from the box and destroy it, would have been competent to testify to that fact; but he had opportunity to take the paper from the box when no one was present, to tear it in pieces and throw the parts away. He had told none of the family of his having made a will; he would probably tell none of them of his having revoked his will. Grover thought it strange that his father should not have told him of the revocation of the will. The revocation of the will put Grover on an equality with the rest of the family. He had not informed the rest of the family when he made a one-sided will in Grover's favor, and it is not unnatural that at the end of his life, when he proposed to set aside the one-sided will and put Grover on an equality with his other children, he should not advise him. To do so would be only to invite remonstrance and discussion, which in his physical condition he would naturally wish to avoid.

Counsel for the appellant argue that the evidence justified the conclusion that Ruth and her mother and Mrs. Faries destroyed the will on the day after the funeral, when they opened the box. There is no evidence on which to base such a charge. The law will not presume the commission of a crime merely because there is an opportunity for it,—even if there is also a motive,—where the circumstances are equally consistent with innocence. Before the death of Eli Holler there was no motive for any of his daughters to destroy his will for the reason that they did

not know he had a will, and, of course, they could not know its contents. There is no evidence that the will was in existence after his death, and the presumption is that he destroyed it for the purpose of revoking it. Until it is shown that it was in existence at his death there can be no basis for the conclusion of its destruction after his death. There was evidence of declarations of Eli Holler of his intention in regard to the home farm in accordance with the disposition made of it in the will. The appellant offered to prove the contents of the will of 1907 to show that it was substantially the same as the will of 1919. The evidence was properly rejected, for the existence of a prior will could throw no light on the question whether the subsequent will had been revoked.

The appellees introduced evidence that the 160 acres of land devised to Grover was worth $400 an acre and the rest of the land much less. The appellant offered evidence tending to show that it was worth not to exceed $250 to $275 an acre, and the objection of the appellees to this evidence was sustained. The appellees' purpose in introducing this evidence was to show the gross inequality of the provisions of the will, which might naturally lead the testator, upon further consideration, to revoke it, and the evidence in rebuttal should have been received. The error was not, however, of sufficient importance to require a reversal of the decree. The will was admittedly one-sided, and the evidence offered and rejected was merely as to the degree. It would not, in any event, have affected the merits of the case. The chancellor saw the witnesses as well as heard them testify, and his conclusion as to their credibility and the weight which should be given to their testimony is entitled to much weight.

In our judgment the decree of the circuit court was right, and it will be affirmed.        *Decree affirmed.*