*In re* BRADLEY'S ESTATE.

BRADLEY *v.* STEINER.

1. WILLS—LOST WILLS—PRESUMPTIONS—EVIDENCE.
Where a will cannot be found at the death of the testator, upon proper search being made, the presumption is that it was destroyed by him *animo revocandi,* but such presumption may be overcome by evidence.

2. SAME—EVIDENCE — OVERCOMING PRESUMPTION — SUFFICIENCY — GREAT WEIGHT OF EVIDENCE.
Where, at the time of testator's death, his will, made about

On evidence to establish lost or destroyed wills, see notes in 38 L. R. A. 433; 50 L. R. A. (N. S.) 861.

three months before his death, could not be found, and a carbon copy of same which he had caused to be sent to his brother was offered for probate, the verdict of the jury disallowing said will is *held*, to be against the great weight of the evidence.

Error to Muskegon; Vanderwerp (John), J. Submitted April 14, 1921.    (Docket No. 94.)    Decided July 19, 1921.

Edward B. Bradley presented for probate a copy of the lost will of James M. Bradley, deceased. The will was disallowed in the probate court, and plaintiff appealed to the circuit court.    Judgment for defendant, Jennie L. Steiner.    Plaintiff brings error.    Reversed.

*Bunker, Rogoski & Dunn,* for appellant.

*Macdonald & Macdonald,* for appellee.

BIRD, J.    This proceeding had its beginning in the probate court of Muskegon county to establish the lost will of James M. Bradley.    The proffered will was denied admission in the probate court.    On appeal in the circuit court the same result was reached.

The deceased, James M. Bradley, was a long time resident of the city of Muskegon.    He had been successful in a business way and for several years prior to his decease he had lived on his income.    His wife died in September, 1918.    After that event his only child, a daughter, Mrs. Jennie L. Steiner, and her husband resided with him.    In April, 1919, he made the will in controversy.    He was then about 79 years of age.    He caused a carbon copy of the will to be sent to his brother, Edward B. Bradley, in Connecticut. In June, 1919, Mr. Bradley became ill, and on July 26th he passed away.    After Mr. Bradley's decease search was made for this will, but it was not found.    Later,

his brother, who had received the carbon copy, offered it as the last will and testament of deceased, and prayed its probate.   With the omission of the formal parts, the will is as follows:

"I. I give and bequeath to my daughter, Jennie L. Steiner, the net income from all real and personal property of which I die seized of and entitled to, to her sole and only use during her life time, which net income shall be payable monthly.

"I direct that my said daughter shall not sell, mortgage, encumber or dispose of any part of the said income, and shall have the same free for her own uses and purposes during the term of her natural life, except as set forth in the succeeding paragraphs.

"II. I give, devise and bequeath to my brother, Edward B. Bradley, of Ansonia, Connecticut, and to his heirs forever, all real property and all personal property to my estate belonging after the death of my said daughter, Jennie L. Steiner.

"III. I hereby direct that the trust hereinafter provided for, shall continue until after the death of my said daughter, and no longer; there being no further occasion for the same, at which time my estate shall be assigned to my said brother and his heirs.

"IV. I direct my executor, hereinafter named, to pay and discharge, out of my estate, all my just debts and the expenses of my last sickness and burial.

"V. I hereby nominate, constitute, and appoint, James F. Balbirnie, of the city and county of Muskegon, Michigan, trustee under this instrument, to take over, maintain, collect and operate all of my estate, both real and personal, and mixed, and to act as such trustee of my estate during the life of my said daughter, Jennie L. Steiner, and to pay over to her the net income from the several parcels of property or the proceeds thereof, and to do and perform all things necessary and proper for the carrying into effect of the intent and purpose of this instrument.

"VI. I hereby nominate, constitute and appoint the said James F. Balbirnie, executor of this, my last will and testament, and I direct that he shall give bond for the faithful performance of his duties as executor and trustee of this, my last will and testament, in such

an amount as the court in which this my last will and testament is probated, shall require. And I direct that my said trustee shall receive annual compensation of one hundred dollars during the period of service, and that my estate be charged with the payment of the premium on said bond."

Upon the trial both counsel recognized the rule that:

"Where a will cannot be found at the death of the testator upon proper search being made, and especially where the will is not traced out of the possession of the testator, it is to be presumed that it was destroyed by him *animo revocandi.*" *In re Keene's Estate*, 189 Mich. 97 (Ann. Cas. 1918E, 367); *In re Walsh's Estate*, 196 Mich. 42 (Ann. Cas. 1918E, 217).

The plaintiff introduced evidence of facts and circumstances which it is claimed overcame this presumption. Defendant introduced testimony to strengthen it, and the issue which was tried out was whether the testator had, in his lifetime, destroyed the will, with the intent to revoke it. After the conclusion of the trial the plaintiff filed a motion for a new trial, alleging many grounds for the same, among them being the ground that the verdict was contrary to the great weight of the evidence. It is our purpose to give this ground some attention.

1. Mr. Bradley was nearly 80 years old when he executed the will in question: He appears to have been a man above the average in intelligence. He attended to his own business matters up to the last and was successful in them. Physically he was above the average. He drove his own automobile and traveled to Florida and other places without attendants. The testimony shows that he was a man of much tenacity of purpose. He had only one child, a daughter. Her erratic course brought much anxiety and sorrow into the lives of both testator and his wife. She had been much married and the fifth husband, with whom she was living at the time of testa-

tor's decease, was not acceptable to either the father or the mother. As indicating his mind toward his daughter, the following letter, which testator wrote to his brother in Connecticut in 1917, will throw some light:

"Yours received. I packed the sword for Edward the night before we started in a hurry and left it with Bert Boyle to forward express paid; am glad Edward received it. I also placed in it copies of our wills. We are getting old and do not know what may happen, and wish to know that Jennie will be looked after by those who will be interested in her welfare. *We know how erratic she is and how easily influenced she is, and have, so far as possible, secured to her all we can, the benefits of what we may leave her.*"

But, notwithstanding this opinion of his daughter, his parental affection for her asserted itself. She was his only child and he desired to do what was best for her. In 1917 he made a will similar to the will in question, but with three additional legacies. Afterwards he paid these three small legacies and made the 1919 will the same in other respects as the 1917 will. This was done only three months before his death. As late as the 21st of May, only a month before he went to the hospital, he showed the will to his trusted friend, Mr. Balbirnie, whom he had selected as his executor and trustee. He gave Mr. Balbirnie certain instructions with reference to the management of his properties. Soon after he was taken ill and was removed to the hospital where he died on July 26th. As soon as he was dead the daughter, or her husband, or both, took testator's keys and took possession of his strong box, where he kept his will and valuable papers. The daughter was urged to accompany the body to the old home in Connecticut, where the burial was to take place, but she refused, assigning as a reason that she was not able to make the journey. On the same day the body left Mus-

kegon she filed a petition in probate court setting forth that her father died intestate and praying the probate of his estate.

There was no effort made to controvert the foregoing facts. Neither was much effort made to deny that the daughter had not been on good terms with her parents for several years by reason of her wayward course, but it is argued that after the mother died in September, 1918, she and her husband went to live with the testator, that their relations were so pleasant that they gradually wore away the ill feeling that the testator had against the daughter and her husband; that after Mrs. Bradley passed away the testator was lonely and the daughter and son-in-law made him such a good home that he changed his former attitude toward them and destroyed the will in question. The daughter testified that early in June her father showed her the will and that after reading it she expressed regret and displeasure over his refusal to give her the estate outright, and that, a few days later, she accompanied him to the cellar, at his request, and testator threw the will into the furnace fire and burned it up. We feel the force of this argument. There is much human nature in it. Notwithstanding the fact that Mr. Bradley had been hurt over his daughter's conduct, he was left alone after his wife's death, and if the daughter and son-in-law came and made a good home for him he would naturally modify his views toward them. This would be in accord with parental affection, and would have a tendency to soften his feelings toward them. We should be inclined to accept this conclusion were there not so many evidences that testator's attitude remained unchanged down to the end so far as the disposition of his estate was concerned. The testator's letter to his brother in 1917 showed that he thought his daughter was erratic and could be easily

influenced.    He wanted her well cared for and he quite likely was fearful if he gave her the estate without restriction that she or the son-in-law would fritter away the estate and she would be left an old lady without means of support.    His letter indicates that he doubted her ability to manage and conserve the estate.    He says in the letter: "We wish to know that Jennie will be looked after by those who will be interested in her welfare."    The testator obviously felt that the way to prevent dissipation of the property was to trustee it.    In this way his desire that the daughter would always have an adequate income would be served, and in addition his desire that in the end his property should go back to the Bradley family in Connecticut, from whom he had received several thousand dollars, would also be served.

Another evidence that no change had come to him with reference to disposing of his property is the fact that after he had lived with the daughter and her husband from October, 1918, to April 19, 1919, he made a new will with exactly the same provision for his daughter as the former will contained.    Still another evidence of the fact is that he talked with Mr. Balbirnie a month before he went to the hospital, showed him the will and instructed him in regard to his property.    This could not have been more than two weeks before the daughter testified he destroyed it.    Although he may have entertained a more friendly feeling for his daughter and son-in-law at the last, this did not furnish a reason why he should change his attitude as to the disposition of his property because his view was that the surest way to protect her was to trustee the estate.    In this way she would be sure of a good living as long as she lived, and in addition he would satisfy his old family sentiment of having his property go back to those from whom a portion of it had come in earlier years.

But, it is said the daughter's testimony shows that the will was actually destroyed in her presence. It perhaps will be sufficient on this phase of the case to say that her testimony does not appeal to us. It is filled with contradictions and inconsistencies and at times it appears reckless. The following incident is one of the many instances which has led us to this conclusion: At the close of the funeral Mr. Balbirnie walked over to her automobile and shook hands with her and offered a word of condolence. She replied:

" 'Jim, I see you are going to be our executor.' I said 'I understand so.' I said, 'Do you know what is in the will?' She said, 'No, I don't.' I said 'Do you want me to tell you?' She said, 'Yes.' " .

It will be difficult to reconcile this conversation with her testimony at the trial in which she testified that her father read the will to her and afterwards destroyed it in her presence. She admits that she was opposed to the disposition of the property which her father made in the will, and that she informed him of her displeasure. While in this mental attitude she got the possession of her father's strong box after he was dead. She secured the keys to it. The will could not be found. These circumstances, considered in connection with the testimony, bring with them, to persons who do not know the truth, certain misgivings as to her conduct in connection with the will.

We are unable to review the entire testimony in this opinion, but suffice it to say that we are all of us satisfied from the record that the will of Mr. Bradley, which was made in April, 1919, was in force at the time of his death, and that he had never destroyed it with intent to revoke it. We are of the opinion that the testimony as a whole fully supports this view.

2. Another serious reason assigned for a new trial is that by affidavit it was shown that during the trial Mr. Steiner, the son-in-law, talked with one of the

jurors about the case.   That he and the juror had a talk in the corridor of the court house is admitted by them, but it is denied that the subject-matter of that talk was the case on trial.   As the case must be reversed on other grounds, and as a recurrence of the incident is unlikely on a retrial it will be unnecessary to consider it further.

We think the verdict was clearly against the great weight of the evidence.   For this reason the verdict must be set aside and a new trial ordered.   The plaintiff will recover his costs of both courts against the defendant.

STEERE, C. J., and MOORE, WIEST, FELLOWS, STONE, CLARK, and SHARPE, JJ., concurred.