54

(No. 32471.—

In re Estate of Thomas P. Moos.—(Rose Moos *et al.*, Appellants, *vs.* Ray Moos *et al.*, Appellees.)

*Opinion filed January 22, 1953.*

EDWIN C. MILLS, of Lincoln, for appellants.

JOHN R. GEHLBACH, and HARRIS & HARRIS, both of Lincoln, for appellees.

Mr. JUSTICE DAILY delivered the opinion of the court:

Thomas P. Moos, a resident of Lincoln, Illinois, executed a last will and testament on January 4, 1950; when he died, eleven months later, the will could not be found. Shortly after his death, Nellie Mae Koester, as executrix, filed a petition in the county court of Logan County, alleging that the will had been in existence after the testator's death; that it was never revoked by him; that it was lost or destroyed, and prayed for the admission to probate, as the will of the decedent, of a carbon copy of the said will which had remained in possession of the draftsman. Her petition was denied and, on appeal to the circuit court, the latter court made an express finding that the decedent had revoked the original will, and denied permission to probate the carbon copy. A freehold being involved, the proponents have appealed directly to this court from the order of the circuit court.

The undisputed facts show that the decedent was unmarried; that he had no children or descendants of deceased children and that his heirs-at-law at his death consisted of brothers and sisters, and the children of deceased brothers, both of the whole and half blood. When the will of January 4, 1950, was executed, Thomas P. Moos was a patient in a hospital at Lincoln and was apparently apprehensive about a forthcoming operation. On that date he caused Robert McCarthy, an attorney with whom he had had no previous dealings, to call at the hospital to discuss a will. Later in the day McCarthy drafted the will and returned to the hospital where decedent executed it in the presence of McCarthy and a fellow patient as attesting witnesses. By its terms the testator devised his residence

to his nephew, Thomas Moos, and another parcel of real estate and his automobile to his nephew, William Moos. Rose Moos, his divorced wife, who was then living at his home as housekeeper, was bequeathed $300 and it was directed that the residue of his estate be converted to cash and divided into nine equal shares between Emil Moos, Sr., and Ray Moos, his brothers, and between the following nieces and nephews: Emil Moos, Jr., William Moos, Thomas Moos, Nellie Mae Koester, Mary Ann Moos, and Norma Moos Shanle, children of Emil Moos, Sr., and Howard Moos, child of Ray Moos. Nellie Mae Koester was named executrix. As thus drawn, the will excluded all of the testator's relatives of the half blood and also failed to recognize Beatrice Jones and Sybil Moos, the children of Tim Moos, a full brother who had predeceased the testator. It is noteworthy, too, that members of the Emil Moos, Sr., family received all of the real estate, and, except for the $300 bequeathed to Rose Moos, seven-ninths of the personal property. They are the proponents of the lost will and the appellants in this court, while the remainder of the heirs, full and half blood alike, are the contestants-appellees.

After the will was executed on January 4, 1950, McCarthy left the original with Thomas P. Moos at the hospital. There is not one iota of evidence that it was ever seen after that date or that the will or its contents were ever mentioned by the testator to anyone. McCarthy did testify that, in response to the testator's wishes, he informed Nellie Mae Koester of the will and of her nomination as executrix, but there is no showing that the testator himself ever discussed the will in question with her. This is true despite a showing that Mrs. Koester was, during the same period, given custody of his bankbooks, given access to his safety-deposit box, which contained some $20,000, and was entrusted with the task of settling his hospital bills. As we interpret the record, the testator

recovered from his operation and was released from the hospital, but was a patient on two other occasions before his death in December, 1950. During the intervals, as later evidence shows, he was able to be about and to transact his own business. Two weeks after his death, Mrs. Koester and McCarthy inventoried the contents of decedent's safety-deposit box and also made a search of his home, but were unable to find the will. This action to probate the carbon copy retained by McCarthy soon followed.

Where a last will and testament, after its execution, is retained by the testator and cannot be found upon his death, it is the well-settled rule of this and of the majority of jurisdictions that it will be presumed to have been destroyed by him *animo revocandi*. (*In re Estate of Morgan,* 389 Ill. 484; *Holler* v. *Holler,* 298 Ill. 418; *Griffith* v. *Higinbotom,* 262 Ill. 126; *St. Mary's Home* v. *Dodge,* 257 Ill. 518; *In re Page,* 118 Ill. 576; 3 A.L.R. 2d 949.) The same cases establish that the presumption is subject to being rebutted by circumstances which tend to show a contrary conclusion, and that the burden is on one seeking to probate such a will to prove that it was unrevoked at the testator's death. In the *Morgan case,* it is stated that the test is whether the evidence shows it unlikely that a testator destroyed his will. To determine this, it has been held that declarations of a testator made a short time before his decease are competent evidence. (*Holler* v. *Holler,* 298 Ill. 418; *Leemon* v. *Leighton,* 314 Ill. 407.) Proof that a testator, whose will cannot be found after his death, entertained a kindly and loving feeling toward the beneficiaries under the will has been held to support the conclusion of nonrevocation by the testator. (*In re Estate of Morgan,* 389 Ill. 484; *In re Page,* 118 Ill. 576.) Proof that persons who had an adverse interest had possession of, or access to, the testator's will, either before or after the testator's death, carries weight in the determination of whether the will, which is lost, was revoked by the testator. (3 A.L.R. 2d

58

976; *In re Bradley's Estate,* 215 Mich. 72, 183 N.W. 897; *In re Hodgson's Estate,* 270 Pa. 210, 112 Atl. 778.) Thus, in the present case, as in all such cases, the issue of whether the carbon copy should be admitted to probate as the will of Thomas P. Moos, gives rise to the query of whether the proof offered by appellants is sufficient to overcome the presumption of revocation by the testator.

The first contention made by appellants is that their proof shows that the will was in existence after the testator's death. This premise is based largely on inferences drawn from statements and conduct attributed to Ray Moos and, while not expressly charged or argued, embraces an underlying thought that Ray Moos unlawfully destroyed the will. The pertinent facts show that, following the death of the testator, Ray Moos, who had been called from his home in Peoria, met with other relatives at the home of Emil Moos, Sr., in Lincoln. Emil, his wife, and Nellie Mae Koester testified that after some general discussion, Ray Moos announced that he was going to spend the night at decedent's house and that he was going to tear the place apart to find out what his brother had left. The witnesses said they sought to dissuade him from going because of the probability that Rose Moos, decedent's housekeeper, and her sister, Elsie Meacham, who was also staying at decedent's house, had already gone to bed, but that Ray persisted. The latter admits he spent the night at decedent's house, but denies that he voiced the motive attributed to him by the others, or that he made a search. The following morning Ray returned briefly to Emil's house, and the testimony of Emil and his wife was that Ray told them, in substance, that since their son Tommy was to get decedent's house, it would be necessary to appoint an "administrator" for him inasmuch as he was a minor. The two witnesses stated that the information surprised them and that it was the first knowledge they had received that their son was to inherit the property. Ray also denies this conversation.

Appellants reason that since Ray did not know of the will, or of its contents, the evening before, he could only have gotten the information he disclosed to Emil and his wife from the will itself. They infer support for such a theory from the testimony of Elsie Meacham regarding the night Ray spent in decedent's house. This witness testified that when Ray asked Rose Moos if there was a will, the latter replied she thought there was, motioning to a cabinet, where deceased sometimes kept personal papers, as she did so. Later in her testimony, the witness, who is partially deaf, stated that she thought Ray was moving around the house later that night. Although the witness slept on a divan in the same room with the cabinet, she saw no person or light but based her conclusion on the fact that she felt the house vibrate as if someone were moving and because she smelled tobacco smoke. In further support of the premise that Ray had found and read the will, attorney McCarthy testified that at a conference of some of the principals, Ray, upon being asked questions which sought to elicit information as to how he could have known the contents of the will the morning after decedent's death, started to answer: "The reason was because I read ———." After which he stopped and angrily left the conference stating that the property was going to be divided into seven shares. Nellie Mae Koester corroborates McCarthy, but Ray categorically denies that he made such a remark and insists, as he did all through his testimony, that the first knowledge he had of the contents of the will came when he received a copy of the carbon copy, by mail, from the probate clerk.

The contention that Ray must have found and read the will in order to know that Tommy was to receive the decedent's home loses its force when the testimony of Rose Moos, appellants' own witness, is considered. Rose testified that she and Ray had not discussed the decedent's estate or will on the night of his death, but related that those subjects

were discussed at breakfast the following morning, at which time the witness told Ray that Tommy was to get the house, that she "knew that," and thought Tommy should have it. Her testimony in this regard appears to be straightforward and unconfused and does not, as appellants suggests, lend itself to the conclusion that Ray led the witness into making the statement. Such evidence must prevail over the vague inferences which appellants seek to draw from the testimony of Elsie Meacham. In cases of this nature, which raise the complementary issue of whether some person has unlawfully destroyed the lost will, this court has held on numerous occasions that it will not be presumed that a lost will has been destroyed by any other person, without the knowledge of or authority of the testator, even though such person may have had the motive and the opportunity, as that would be presuming a crime. (*Holler* v. *Holler,* 298 Ill. 418; *Griffith* v. *Higinbotom,* 262 Ill. 126; *St. Mary's Home* v. *Dodge,* 257 Ill. 518; *Stetson* v. *Stetson,* 200 Ill. 601.) There is no satisfactory evidence here that the will in question was ever in the decedent's home or that Ray ever made a search for it or had the opportunity to do so. When all the circumstances revealed by the evidence are considered they weigh heavily in favor of the belief that Ray did not, in fact, make a search or find the will, but that he learned from Rose Moos that there was a will and that, by its terms, Tommy was to receive decedent's home. As it appears in the record, we cannot say that such evidence creates any legal or moral certainty that the will alleged to be lost was in existence at the testator's death.

Failing this contention, appellants urge that the presumption of revocation by the testator is effectively overcome by evidence which shows that the testator maintained an attitude of friendship, confidence and reliance toward the proponents up to the time of his death. Evidence of such nature has been held to reflect the attitude of a testator

which makes it unlikely that he would have revoked a will benefiting those with whom he continued to have harmonious relations. The weight to be given such evidence, however, necessarily varies with the given facts of each case. (*In re Estate of Morgan,* 389 Ill. 484; *In re Page,* 118 Ill. 576.) There was evidence in this case, which was the subject of testimony offered both in rebuttal and surrebuttal, that the testator held the proponents in high regard both before and after the execution of his will and until the date of his death. However, even accepting appellants' version of the relationship as controlling, we are of the opinion that such evidence standing alone is insufficient to show an unlikelihood that the testator would revoke his will.

In the decisions we have examined, many of which are analyzed in the *Morgan case,* the evidence of continuing friendly and loving relations was supplemented by declarations of the testator, made subsequent to the execution of the will and prior to and at the time of death, which showed an unchanged attitude on the part of the testator relative to the disposition of his property. Here, there is no such supplementing evidence or declarations inconsistent with the idea that the testator had revoked his will. It will be recalled, rather, that the testator did not at any time mention the will or its contents either to a beneficiary or a stranger. The will was left in his custody on January 4, 1950, the date it was executed, and was never again seen in the eleven months which elapsed before his death. In seeking an explanation of the testator's actions, we believe it is significant to remember that the will in question was executed while he was apprehensive about the results of an approaching operation. He made a recovery and was able to be about and conduct his business affairs; having survived the operation, he may well have changed his intentions about his property. Such a thought is strengthened by the testimony of Leland Miller, a Lincoln attorney, who had, at times, performed legal services for the testator.

Miller testified that in October, 1950, two months before Thomas P. Moos died, the two men had a conversation on the street, in which Moos asked how much it would cost to draw his will and stated that he might want Miller to draw one for him.

To further show that it was unlikely that the testator would revoke his will, appellants introduced evidence that the deceased had often remarked that he did not want his relatives of the half blood or his nieces in Texas to share in his estate, a result which occurs if it be held that he died intestate. As against this, there was evidence that the testator maintained friendly relations with a relative of the half blood who lived near him, who was a frequent visitor at his home and who often performed little kindnesses for the testator. Here again, the state of the record equally lends itself to a conclusion that the testator may have changed his intention of completely excluding his relatives of the half blood from sharing in his estate.

Taken in its entirety, we believe that the proof is not sufficient in quality or quantity to show that it is unlikely that the estator would revoke his will, or to create a moral conviction that he did not revoke it. The circumstances shown by the evidence are equally, if not more, consistent with the thought that the testator changed his intentions relative to the disposition of his property and destroyed the will himself. However, even accepting the appellants' evidence in its strongest light, we are of the opinion that it is not of a nature satisfactory to rebut the presumption that the will was revoked by the testator or to establish the manner in which his estate should be distributed.

Finally, appellants argue briefly that the doctrine of dependent relative revocation should be applied to revive and restore the revoked will. While it is problematical as to whether the doctrine would be applied in this jurisdiction to restore an entire will, the contention of appellants must fail because there is no evidence here that the revocation of

the old will depended upon the efficacy of a new one. *Leemon* v. *Leighton,* 314 Ill. 407.

In our judgment the order of the circuit court of Logan County was right, and it will be affirmed.

*Order affirmed.*