In the Matter of the Estate of Sady B. Marsh, Deceased. Irene Langlois and William Langlois, Petitioners-Appellees, v. Carolyn S. Snodgress, Melvin C. Smeck and Gary Robert Hanson, a Minor, Respondents-Appellants.

**Gen. No. 48,333.**

First District, Second Division.
April 18, 1961.
Rehearing denied May 9, 1961.

Barnard and Barnard, of Chicago (Morton John Barnard, of counsel) for Carolyn S. Snodgress and Melvin C. Smeck, respondents-appellants, and Herbert A. Glieberman, of Chicago, guardian ad litem for Gary Robert Hanson, a minor, respondent-appellant.

Arthur George, of Chicago, for appellees.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Sady B. Marsh, a widow, died at Chicago on April 15, 1960. On April 21, 1960, Albert W. Dilling filed a petition to admit to probate as the will of decedent an instrument dated October 23, 1959, which purported to leave her estate to the Grand Chapter of the Order of the Eastern Star of Illinois. Proof of heirship established that decedent died leaving as her only heirs her brother, Melvin C. Smeck, her niece Dorothy Jacobs,

adopted daughter of her deceased brother William Smeck, and her grandnephew Gary Robert Hanson, a minor, son of an adopted son of the deceased brother, the adopted son also having predeceased decedent. On July 6, 1960, Carolyn S. Snodgress, daughter of Melvin C. Smeck, filed a petition stating that Mrs. Marsh died without leaving a will and asking issuance of letters of administration to her. On the same day Irene and William Langlois, husband and wife, filed their petition stating that decedent left an instrument dated March 16, 1960, purporting to be her will in which she nominated Gilbert T. Graham as executor, and prayed that the will be admitted to probate and that letters testamentary issue. Attached to the petition was a copy of the purported will of March 16, 1960, in which all of the property of decedent was bequeathed to Mr. and Mrs. Langlois in equal parts, or if one of them predeceased the testator, to the survivor. On the filing of these petitions Mr. Dilling withdrew his petition to admit to probate the will of October 23, 1959. The Probate Court admitted to probate as the will of Mrs. Marsh an unexecuted copy of an instrument dated March 16, 1960, the original of which was executed by her as her will of that date. Carolyn Snodgress and the heirs, appealing, ask that the order be reversed and that the cause be remanded with directions to deny admission to probate of the carbon copy of the March 16 will as the last will of Sady Marsh, deceased.

██ Appellants urge that since petitioners filed no answer to the Snodgress petition for letters of administration and no reply to the answer of Snodgress and Smeck to the petition to admit the March 16 instrument to probate, the allegations of the Snodgress petition that Mrs. Marsh died intestate and the allegations of the answer of Snodgress and Smeck that the March 16 will was revoked by decedent, stand unchallenged and are admitted under the provisions of the Civil

103

Practice Act; that on the basis of the pleadings alone the Probate Court should have refused to admit the copy of the March 16 will to probate as decedent's last will and should have adjudged her to have died intestate and issued letters of administration as prayed by Snodgress. Section 40(2) of the Practice Act provides that every allegation, except allegations of damages, not explicitly denied, is admitted except under certain provisions not applicable to this case. Section 5 of the Probate Act provides that the Civil Practice Act applies to proceedings under the Probate Act. The evidence was submitted and the case tried on the basis that issues were joined on the proposition passed upon by the trial judge. During the trial appellants did not raise the point of pleading now urged and are in no position to assert that appellees admitted the allegations of the petition and the answer. Where a party proceeds with the case as though his adversary's pleading joining issue were on file, he waives his adversary's failure to plead.

We turn to a consideration of the contention of appellants that the court erred in admitting the will of March 16 to probate. The rule is well established in this state that a will last known to have been in the possession of the testator which cannot be found upon his death is presumed to have been destroyed by the testator with the intention of revoking it, and under these circumstances the burden is on the proponents to prove that the proffered will was unrevoked at decedent's death. See In re Estate of Moos, 414 Ill. 54, 110 N.E.2d 194; Koester v. Jennings, 334 Ill. 107, 165 N. E. 650; Leemon v. Leighton, 314 Ill. 407, 145 N. E. 631; St. Mary's Home for Children v. Dodge, 257 Ill. 518, 101 N. E. 46; In re Estate of Maximiuk, 29 Ill. App.2d 144, 172 N.E.2d 524 (Abst.). The same rule has been followed in other jurisdictions. Appellants insist that petitioners failed to overcome the presump-

tion of revocation of the March 16 will of decedent and that the declarations and conduct of decedent showed an intention to revoke the will. Petitioners say that the declarations and conduct of decedent do not show an intention to revoke the will, that the will was not destroyed by Mrs. Marsh with the intention of revoking it, and that the undisputed record contains ample support for the order.

On April 15, 1959, Mrs. Marsh executed a will in which she provided that if she was in the Eastern Star Home of Rockford, Illinois, at the time of her death, all of her property was to go to that home but if she was not in the home at the time of her death, all of her property was to go to Irene and William Langlois. On October 23, 1959, she made a second will in which she left her entire estate to the Grand Chapter of the Order of the Eastern Star of Illinois. On March 15, 1960, Mrs. Marsh was visited by her attorney, Gilbert T. Graham. She told him that she had been to the Eastern Star Home twice. She went the first time and did not like it, came back, went a second time, did not like it and came back. She said she wanted to make out a new will and leave her property to the Langlois'. On March 16, 1960, Graham brought the March 16 will to decedent for her signature. This will revoked all prior wills and gave all her property to the Langlois' in equal parts, or, if one of them predeceased her, to the survivor. Graham was named as executor. The March 16, 1960 will was signed in the presence of Pearl Rowley, Mary Purtell and Graham, all of whom signed in decedent's presence. They believed decedent to have been of sound mind and memory at that time. Graham, who prepared the April 15, 1959 will, brought it with him when he called on decedent on March 16, 1960. After the March 16 will was executed and attested, decedent tore up the April 15, 1959 will and threw it in the waste basket. Graham gave decedent a plain unexecuted

105

carbon copy of the March 16 will and retained the original executed copy which he returned to his office. After he returned to his office he made notations on the document which was his office copy and which he retained in the office. This office copy became petitioners' evidence of the will.

On April 3, 1960, Graham received in the regular course of the mail a letter dated April 2, 1960, written and signed by decedent and addressed to him in which she requested him to mail her the Langlois will which she would tear up. About April 11, 1960, Graham received a call that decedent had had another heart attack and wanted to change her will. On Monday, April 11 Graham and his secretary, Miss Purtell, went to the New Lawrence Hotel, Chicago, to see decedent. He brought the original March 16 will with him. Decedent said she wanted to destroy her will. Graham handed her the March 16 will and said that if she wanted to make a new will that they could write it out in longhand and then she should tear up the March 16 will. Decedent said she was going to tear it up but she wouldn't tear it up then, she would probably do it later. The last Miss Purtell saw of the March 16 will it was in decedent's hand in the hotel room. Graham said that when he handed it to decedent she laid it on the table in her room and the last he saw of it was on the table. That was the last time he saw her alive. No one saw the original will of March 16, 1960, after that time.

About 9:00 or 9:30 the morning of Friday, April 15, 1960, Martha Floyd, the maid who took care of decedent's room, was approached by two women, one of whom had a bowl of soup she had brought. One of the women asked the maid to open the door to decedent's room. They found her lying on the bed. The maid called the manager of the hotel, Ruth Bell, who went up to the room and found decedent lying on the bed,

106

apparently dead. The maid and a little old gray-haired woman were in the room at the time. The manager did not notice anything unusual on the table or on the desk relative to papers of any kind. She asked the maid and the other woman to leave the room and called the doctor, Mrs. Langlois and the police to come at once. Mrs. Langlois had told the manager that she was a niece of decedent. Mrs. Langlois arrived at the hotel within 20 minutes to a half hour after the manager called her. She did not go into the room until the police came. After the police officers left and the body was removed the room was sealed. After receiving the call from the hotel manager, Mrs. Langlois called Graham and went to the hotel. When she got in the room the manager was there, and there were one or two policemen. She saw decedent lying on the bed and noticed papers on the desk in the room. She sorted the papers and picked up some of them from the desk and gave them to the detective. She looked for the original March 16 will among the papers. She did not find it. She searched on the desk and looked in a little cubby hole for other papers or anything of value. She did not see anything that looked like the March 16 will. Melvin Smeck first entered the apartment about 3 or 4 o'clock on the afternoon of April 16, the day after Mrs. Marsh died. His wife and daughter, Carolyn Snodgress, were with him. He searched the apartment thoroughly but did not see any document that looked like a will or that looked like a document of which petitioners' exhibit is a copy. He did not after the death of his sister see the original March 16 will. He examined all the documents that he found in the apartment at that time. He was formerly an officer of a bank and had occasion to see many wills during that time and would recognize one if he saw one. Neither Mrs. Smeck nor Carolyn Snodgress saw the original of the March 16 will or anything that looked like it.

107

The undisputed evidence shows that the original instrument in dispute was duly executed by Mrs. Marsh on March 16, 1960. From then until April 11, 1960, it was kept by attorney Gilbert Graham in his office. Shortly after April 2, 1960, Graham received a letter from decedent requesting him to mail the will to her so that "I will tear that up." On April 11, 1960, Graham delivered the original will to decedent. She said, "I am not going to destroy it now. I will probably do it later." Graham handed her the original March 16 will. She laid it on the table in her room. That was the last he or anyone else other than decedent saw of it. No other evidence as to its whereabouts was offered. There is no evidence that anyone saw decedent alive after Graham handed her the March 16 will on April 11, 1960. This narrows the time for the will's destruction to sometime between its delivery by Graham to Mrs. Marsh on April 11 and the time of her death about 9:00 A.M. on Friday, April 15. There is no evidence that anyone other than decedent had possession of the original instrument or saw it or knew of its whereabouts during this time, nor is there anything to indicate that the will was lost or destroyed by accident or misplaced by decedent. There was not one declaration by her inconsistent with the fact that she had revoked her will. She did not at any time mention the will or its contents to the Langlois' or to any person other than Graham and his secretary. Mrs. Rowley, one of the attesting witnesses, testified that the decedent took particular pains to see that she did not know the contents of the will.

▇ Except for the testimony of Ruth Bell and most of the testimony of Martha Floyd and the admissible portion of Irene Langlois' testimony, all of which concerned matters transpiring subsequent to decedent's death, substantially all of the evidence offered by petitioners related to events occurring prior to the time

108

when Graham delivered the original March 16 will to decedent on April 11. Most of the evidence offered by petitioners related to events that occurred prior to the execution of the March 16 will and can in no way show any intention formed by her thereafter. The testimony of Graham and Mrs. Purtell showed an intention on decedent's part to revoke the March 16 will. The only utterance of decedent after April 11 that appears in the record is the Easter card received by petitioners postmarked April 14 at 4:30 P.M. This postcard in no way showed any intention on decedent's part to revoke her will, and showed that the friendship between the Langlois' and Mrs. Marsh which began in 1958 continued until her death. The record shows the kindly and considerate treatment to Mrs. Marsh by the Langlois'. This is not sufficient to overcome the presumption of revocation. In the Moos's Estate case, 414 Ill. 54, 110 N.E.2d 194, the court said (61): "There was evidence . . . that the testator held the proponents in high regard both before and after the execution of his will and until the date of his death. However, even accepting appellants' version of the relationship as controlling, we are of the opinion that such evidence standing alone is insufficient to show an unlikelihood that the testator would revoke his will."

In arguing for affirmance petitioners point out that the letter of April 2 received from decedent by Graham contained other matters in addition to a request to him to mail her the Langlois' will. They also call attention to the testimony of Pearl Rowley, one of the witnesses to the will. She testified that she knew Mrs. Marsh about 8 years and visited her quite often; that she visited Mrs. Marsh the evening of April 1; that she visited her 4 or 5 days after April 1; that she visited her at least one time after that; that it must have been about the middle of the second week, about Tuesday or Wednesday of the second week; that decedent

109

seemed pretty worried about something; that decedent had lost or mislaid some kind of an important paper or document; that witness told decedent she would know where she put everything, especially if it would be a legal document; and that witness asked whether decedent had a special place for important papers and decedent replied that she did.

The conversation related in the testimony of Mrs. Rowley took place prior to April 11, when Graham delivered the March 16 will to decedent. Mrs. Rowley testified that the conversation took place on a Tuesday or Wednesday afternoon, that she last visited decedent 2 or 3 days later, and that this visit was 2 or 3 or 4 days before her death. Since decedent's body was found about 9:00 A.M. on Friday, April 15, according to Mrs. Rowley, the conversation could not have taken place on the preceding Tuesday or Wednesday, April 12 or 13, and must have taken place one week earlier, which was prior to the delivery of the will to decedent by Graham. If the conversation had taken place after April 11, there is nothing to indicate that decedent was referring to the March 16 will. She spoke of the missing item as a "paper" or "document" not a will. The decedent knew the importance of a will. If she had misplaced the March 16 will it would have undoubtedly been found in her apartment after her death, since there is nothing to show that she took it out of the apartment. Petitioners also offer the testimony of Martha Floyd, the maid who took care of decedent's room, to the effect that she did not notice anything unusual or torn paper or scraps of paper in decedent's waste basket, and did not notice any copy similar to the blue jacket shown her that were torn or ripped in the waste basket when she came into the room to clean it out any time during the week of April 15. On cross-examination she testified that she did not look through the waste basket to see what was in it

110

but would throw out the contents without noticing anything in the basket. The failure of the maid to notice any torn pieces of paper does not prove that no torn pieces of paper were in the waste basket. Unless there was some reason for the maid to examine the contents of the waste basket or her attention was called to it in some manner, it is unlikely that she would do so, and her failure to notice any such paper does not in any way negative the fact that the will was destroyed. It will be observed that the maid failed to notice the pieces of the April 15, 1959 will that Graham testified was torn up and thrown in the waste basket following the execution of the March 16 will. If Martha Floyd failed to notice the scraps of paper that were definitely established as having been torn and thrown in the waste basket, she could not be expected to notice scraps of paper of a later document that may have been destroyed in a similar or some other manner.

The declaration and conduct of decedent showed an intention to revoke the will. In addition to the statements of decedent her conduct was consistent with an intention to revoke her March 16 will. Every will that decedent executed remained with her attorney following its execution. Graham delivered the March 16 will to her on her request. She intended to revoke it. Had she changed her mind and decided not to revoke the will, it would be reasonable to assume that she would call Graham to come and get it. We have carefully read the opinion in the Morgan Estate case, 389 Ill. 484. In that case the evidence showed not only a continued friendly and loving friendship but was supplemented by declarations of the testator made subsequent to the execution of the will and prior to the time of death showing an unchangeable attitude on the part of testator relative to the disposition of his property.

■ Petitioners suggest that the two elderly ladies who brought decedent a bowl of soup on the morning

111

of April 15 may have been involved in a plot to destroy the will. There is no evidence that either of them had ever seen the will, knew of its existence or had access to it. The testimony of the maid shows that although one of them had a key to the room she did not enter it before asking the maid to open the door so that she could take the soup to Mrs. Marsh. Even if it were conceivable that either lady could have known of the existence of the will or could have taken possession of it, what motive could she have had in destroying it? In the Moos' case the court said that it will not be presumed that a lost will has been destroyed by any other person "without the knowledge of or authority of the testator, even though such person may have had the motive and the opportunity, as that would be presuming a crime." There is no conflict of testimony among the witnesses. The question is, whether believing the truthfulness of all the testimony, the court is warranted in concluding that the presumption of revocation has been overcome by positive evidence. Much of the testimony introduced by petitioners related to matters occurring prior to the execution of the March 16 will. This testimony indicates the motivation for the execution of that instrument. That testimony has no bearing on decedent's intention subsequently formulated, as evidenced by her letter to Graham of April 2 and her conversation with Graham on April 11 and the fact that the will could not be found after its delivery by Graham to her on that date.

We conclude that petitioners failed to overcome the presumption of revocation of the will by decedent. The declarations and conduct of decedent show an intention to revoke the will. The April 15, 1959 will was revoked by the October 23, 1959 will. The latter will was revoked by the March 16, 1960 will. The petition to admit the October 23, 1959 will to probate

was withdrawn since the execution of the March 16 will revoked the October 23 will. Under Sec. 46 of the Probate Act (Sec. 197, Ch. 3, Ill. Rev. Stat. 1959) revocation of the March 16 will did not revive the October 23 will even if physically in existence. For the reasons stated the order of the Probate Court entered October 10, 1960, admitting the March 16 will to probate is reversed and the cause is remanded with directions to deny admission of the carbon copy of the March 16, 1960 will to probate as decedent's last will and to adjudge that decedent died intestate.

Order reversed and cause remanded with directions.

FRIEND, J. and BRYANT, J., concur.