Edna C. Burton, Appellee, *vs.* Della Wylde *et al.*
Appellants.

*Opinion filed December 17, 1913—Rehearing denied Feb. 6, 1914.*

1. Wills—*a will cannot be revoked by spoken words.* Under the statute a will or codicil can only be revoked by burning, canceling, tearing or obliterating the same or by the making of another will, and not by spoken words.

2. Same—*presumption where a mutilated will is found among testator's papers after his death.* Where a will remains in the testator's possession until his death and is then found among his papers with erasures, alterations, cancellations or tearings, the presumption is that the acts so manifested upon the will were done by the testator with the intention of revocation; but such a presumption may be rebutted by proof of the facts.

3. Same—*"tearing" of a will includes cutting.* The "tearing" of a will includes cutting, and it need not be the cutting of the whole will, as any tearing or cutting with intent to revoke the whole will is sufficient for the purpose.

4. Same—*declarations of testatrix, after cutting will, are admissible to show intent.* Where the signature of the testatrix is cut from a codicil to the will in such a manner as to mutilate the will itself, declarations of the testatrix, made either at the time of or after the cutting, are admissible for the purpose of showing whether she intended her act to operate as a revocation of the will itself.

Appeal from the Circuit Court of DeKalb county; the Hon. Mazzini Slusser, Judge, presiding.

H. S. Earley, George Brown, and Cliffe & Cliffe, for appellants.

Roy H. Brown, and Faissler & Fulton, for appellee.

Mr. Justice Carter delivered the opinion of the court:

This is an appeal from a decree of the circuit court of DeKalb county admitting to probate the will of Sarah Chapman, deceased, and refusing the probate of a codicil thereto attached.

The will was executed April 11, 1895, the codicil November 3, 1899. Sarah Chapman, the testatrix, died at ninety years of age on July 5, 1912, at her home in Kingston, DeKalb county, Illinois, possessed of property valued at a little over $35,000, practically all real estate. Her husband had been dead for many years and she left no children, her only heirs being some thirty nephews and nieces. About a week after her death Mrs. Edna C. Burton, a niece of testatrix, with whom she was living, filed in the county court of DeKalb county a petition for its probate. Very shortly after the hearing as to the probate of the will began before County Judge William L. Pond he re-called that he had heard a conversation with the testatrix a short time prior to her death which might make it inadvisable for him to pass upon the case. Upon consultation with the attorneys it was agreed that after hearing the formal proof as to the execution of the will it should be admitted to probate and an order entered refusing probate of the codicil without hearing any further testimony and that an appeal should be taken to the circuit court. This was done. That the instrument in question and the codicil were originally the valid will and codicil of the testatrix and were properly executed and that the codicil was properly revoked is conceded. The whole contention is as to whether the will itself was revoked.

The will was written on three pages of a double sheet of legal cap paper. The attestation clause was at the top of the fourth page, and below this a codicil had been written and attested. When the will was produced for probate the signature of the testatrix to the codicil had been cut out with some sharp instrument, destroying at the same time certain words that appeared in the residuary clause on the other side of the page. The will gave certain real estate to Henry Carb, the nephew of the testatrix, whom she called her foster son; other real estate to her brother, Alexander H. Durham; other real estate, under certain conditions, to

Jesse F. and Edgar C. Burton, and an eighty-acre tract to her great-nephew, Sidney Fay Burton. Then followed clause 5 as to the residue, reading:

"*Fifth*—All the rest, residue and remainder of my real estate, both real and personal, I give, devise and bequeath to my niece, Edna C. Burton, and to her husband, my nephew, Charles H. Burton, to be
equally divided
and their heirs
the child or children of a deceased child taking the share which his, her or their parents would have taken if living."

The blank space indicates where the words were cut out of the will by the cutting out of the signature of the testatrix to the codicil on the reverse side of the page. By the codicil there was a change in the devise of real estate to Henry Carb from an estate in fee to a life interest, the life interest after his death to go to his wife and after her decease the remainder to their children. The proof shows that Henry Carb became insane some time prior to May, 1903, and died in 1904. The proof also shows that on June 25, 1912, ten days before her death, the testatrix deeded to Sidney Fay Burton, the son of Mrs. Edna C. Burton, the eighty acres of land given him under the will. There is no evidence in the record as to when the signature to the codicil was cut out. The document was found among the testatrix's papers after her death.

Under our statute a will or codicil can only be revoked by burning, canceling, tearing or obliterating the same, or by some other will, and no words spoken shall revoke any will. (Hurd's Stat. 1911, p. 2379.) As a general rule, if a will is traced to the testator's possession and at his death cannot be found the presumption is that he destroyed it *animo revocandi*. (*St. Mary's Home* v. *Dodge*, 257 Ill. 518; *Taylor* v. *Pegram*, 151 id. 106.) Where a will remains in the testator's possession until his death and is then found among his papers with erasures, alterations, cancel-

lations or tearings, the presumption is that such act manifest upon the will was done by the testator with the intention of revocation. (Page on Wills, sec. 449; 40 Cyc. 1280, and cases cited.) But all presumptions of this sort weigh lightly and they may be rebutted by proof of actual facts. Schouler on Wills, (2d ed.) sec. 401.

Counsel for appellants insist that the cutting out of the signature to the codicil, and thereby cutting out a part of the residuary clause of the will, in view of all the circumstances in this case, shows clearly that testatrix intended to revoke the entire will, while counsel for appellee insist that the cutting out of the signature only revoked the codicil, and does not indicate, even though the will itself was slightly mutilated, that the testatrix intended to revoke the will as a whole. They further insist that any declaration of the testatrix made after the will was mutilated cannot be properly received in evidence.

The authorities are practically all agreed that where a testator has wholly or partially destroyed or mutilated, torn or canceled his will, the declarations made by him at the time of the doing of such act are admissible as a part of the *res gestæ* to show with what intent he mutilated or destroyed the instrument. (*Managle v. Parker*, 24 L. R. A. (N. S.) 180, and authorities cited in the note.) There is an irreconcilable conflict in the authorities as to whether declarations of the testator made after the revocation of the will are admissible to show intent. (14 Ency. of Evidence, 448, 453, and cases cited; 30 Am. & Eng. Ency. of Law,—2d ed.—637.) In Jarman on Wills (6th ed. p. 147) the author says: "Declarations made by the testator are admissible as evidence of his intention, those made at the time of destruction being, of course, of greater weight than those made subsequently." In Page on Wills (sec. 450) the author says: "The declarations of the testator, by the weight of authority, are admissible to show his intention to revoke or not to revoke, where such intention is mate-

rial, whether such declarations strengthen or rebut any presumption raised from the established facts, even where such declarations are made subsequent to the time of the alleged revocation." In Schouler on Wills (2d ed. p. 423) it is stated: "Parol evidence of an intention to revoke or change one's will has been admitted in cases where the papers themselves left the point in doubt, and if it be uncertain from the face of the instrument whether substitution was intended or something additional by way of gift, the testator's purpose may be cleared by evidence *aliunde.*"

The mere physical act of cutting out a portion of the will here in question is equivocal in its nature. It might or might not have been intended by the testatrix as a destruction of the will as well as the codicil. Beyond question, extrinsic evidence might make plain the intention with which the act was performed.

Whether the subsequent declarations of the testator are admissible to make plain the intent as to the partial cancellation or tearing of a will or codicil has never been raised and decided in this court, but the question of such declarations as to lost or destroyed wills has been passed upon and such declarations have been held admissible. In *Boyle* v. *Boyle,* 158 Ill. 228, the will of the testator was destroyed. The fact of its destruction was established by declarations of the testator made subsequent to the destruction of the will. Such declarations were held admissible. It is clear, also, from the reasoning in that and other decisions that this court has always assumed that the declarations of the testator were admissible to show intent. (See *Wolf* v. *Bollinger,* 62 Ill. 368; *In the matter of Page,* 118 id. 576; *Stetson* v. *Stetson,* 200 id. 601; *St. Mary's Home* v. *Dodge, supra.*) The encyclopædias and other books of reference, in discussing this question, class this State among those permitting the admission of subsequent declarations to prove intent. If declarations of this nature are admissible to show the total destruction or cancellation

of the will there can be no escape from the conclusion that they are admissible to show partial mutilation, cancellation or tearing of the will.

The word "tearing" has been held to include cutting, and it need not be the cutting of the whole will. (1 Red-field on Wills,—4th ed.—p. 313; 1 Jarman on Wills,—6th ed.—p. 144; Page on Wills, sec. 248.) This last author says in the same section: "Any act of tearing which is manifest upon the paper on which the will is written, however slight it may be, is an act of tearing within the meaning of the statute, if done with the intention of re-voking the will. This is equally true whether a necessary part of the will is torn off, like the signature of testator or of witnesses or a part of the dispositive part of the will, leaving the residue, * * * or whether an unnecessary part of the will is torn away, such as a seal where a will need not be under seal." The authorities, we think, are all agreed that the slightest act of tearing with intent to re-voke the whole will is sufficient for the purpose; that it is the animus which must govern the extent and measure of operation to be attributed to the act and determine whether the act shall effect the revocation of the whole instrument. (40 Cyc. 1191, and cases cited; *Johnson* v. *Brailsford,* 10 Am. Dec. 601.) This court has so held. *Bohleber* v. *Reb-stock,* 255 Ill. 53.

There was no evidence of declarations of the testatrix or anyone else offered which were made at the time the act was committed. Several of the witnesses testified as to the subsequent declarations made by the testatrix which have more or less bearing on the question of intent. Benjamin C. Meade, a resident of Belvidere, Illinois, a city not far from Kingston, had known Mrs. Chapman some fifty or sixty years. He testified that several years before, while he was taking her in a buggy to one of her farms, she had stated that she was not getting along very well with the Burtons. She was then living with them. She further

stated that she had made a will but had destroyed it, and on account of the treatment of some of her relatives would not make another but would let them all take under the law. J. E. Scott, a real estate dealer in Genoa, testified that his son, then a minor, rented land of Mrs. Chapman; that she came to his office in the spring of the year in which she died to talk about the lease, and stated, while there, that she was going to leave her property without a will; that her husband had left his that way; that she had once made a will but had destroyed it. G. E. Scott, another son of the last witness, a practicing lawyer at Genoa for some sixteen years, testified that he was well acquainted with the testatrix and had known her as long as he could remember; that she was a frequent visitor at his office and he had discussed business matters with her frequently; that he saw her the last time about a week or ten days before her death. She told him at this last interview that she wanted him to come down to Kingston to do some business for her. He asked her if she wanted him to come prepared to make a will, and she said no,—that she had made a will but destroyed it; that her husband did not leave a will, and her sister, Ursula Porter, did not leave any will, and the property in those cases had gone to the heirs, and that she was going to do the same thing with hers and let the heirs take it under the law. Sophronia Eiklor testified that she had known Mrs. Chapman fifty-five years and that they used to talk over business matters often; that she had talked with her two or three years before her death at her home, and that when they were visiting together at this time "I told her that I had made a will," and she said she had made one once but afterward destroyed it.

The proponent of the will called County Judge W. L. Pond, who testified that he had known the testatrix ever since he was a boy; that he had a conversation with her in Kingston about three months before her death, in which

they talked over the trouble there had been in settling the estate of the testatrix's sister, Mrs. Ursula Porter. This sister had died very suddenly when she was apparently in good health. Judge Pond said to the testatrix that certain matters in connection with the sister's estate should have been attended to by the sister when she was in good health, and the testatrix responded, "Yes, that's right; I am somewhat in the same situation; my trouble is in regard to my relatives, but I have attended to that matter some time ago." He testified she had not said how she had attended to it and that the word "will" was not mentioned by either of them during the conversation, either with reference to her property or the sister's. Sadie Andrews also testified for the proponent. She had known Mrs. Chapman for a long time and last saw her on June 1, 1912, when she visited her at her home in Kingston. She was then living with the Burtons. There was some talk between them about Mrs. Burton finding fault because the testatrix was letting Sidney Burton have too much spending money, and Mrs. Chapman said to the witness, "They will have it some time, and I would rather have the flowers now than after I am gone;" that the other nephews and nieces thought they ought to have the same share as Edna and the boys, (Edna was Mrs. Burton,) but that she (the testatrix) had known the boys ever since they were babies and she didn't see any reason why they should not have her property. S. S. Slater also testified for the proponent that he was in business at Genoa, Illinois, and had often seen the testatrix and often talked with her about business matters; that in June, 1912, he got to talking with her about the affairs of her sister, Mrs. Ursula Porter, and she remarked that she thought it was very strange that her sister would let her business go at loose ends; that there would be no trouble over her (testatrix's) property when she was gone, as she had fixed it so as not to leave it for the lawyers. Slater further testi-

fied that at this conversation she stated she thought Ursula had a will and supposed that everything had been fixed up. It is uncontroverted that the sister, Ursula Porter, did not have a will.

The declarations of the testatrix in these various conversations had with the different witnesses may not be entirely consistent, but those declarations are much more easily reconcilable on the basis that she had destroyed her will than they are that she had only intended to destroy the codicil and leave the will itself in force. In no place in any of those conversations did she mention the codicil. Furthermore, she did not refer to her will in any of her conversations with the witnesses, in the testimony offered by proponent. To four different witnesses she specifically stated that she had made but destroyed her will. A fair construction of her talk with Judge Pond does not indicate that she was thinking about the fact that she had a will and her sister, Mrs. Porter, did not have a will. Nothing was said as to the will by either of them. As to what the difficulties were over Mrs. Porter's estate does not appear in this record. The difficulties may have arisen entirely over disputes that would not have been obviated in the slightest if there had been a will. Her statement to Slater that there would be no trouble over her property might easily be explained on the ground that she had her business affairs closed up so there would be no trouble. Indeed, this statement tends to show that, because she said in that conversation that her sister had let her business go at loose ends and that she was not going to leave hers in such shape so that it would be left to the lawyers. Surely there is no more reason to think the lawyers would get a part of the estate if there was not a will than there would be if there was a will. The declaration she made to Sadie Andrews that she did not see any reason why the Burton boys should not have it is not irreconcilable with the rest of her testimony, in view of the fact that about ten days before her

death she deeded eighty acres of land to one of the sons of Mrs. Burton. It would seem strange, indeed, that she should deed this eighty acres at this time if she thought the will was in force which gave him this same eighty. Furthermore, it is somewhat difficult to understand why she would want to revoke the codicil, alone. By that codicil she cut down the estate left to Henry Carb, her nephew, from a fee to a life estate, with remainder to his wife and children. Before her death Carb himself died. If the will were left in force Carb's heirs would take this property, as they would if the codicil were left in force. It is absolutely impossible to reconcile her declarations, made to four different witnesses, as to the destruction of the will, with the theory that she considered the will still in force. The attesting clause of the codicil stated that it was published and declared by the testatrix "to be her will and testament," etc. A person not very familiar with legal forms and the drafting of wills might readily have thought that the destruction of the codicil would destroy the will. Intelligent, careful woman that she was shown to be, how should she expect the will to remain in force if she cut a portion out of it, even though that portion might be small? In view of all the evidence in the record, in the light of the condition in which the will was found among the papers of the testatrix at her death, we can reach no other conclusion, under the authorities, than that she herself cut out her signature with the intention of revoking the entire document. The circuit court should have so found.

The decree of the circuit court will be reversed and the cause remanded for further proceedings in accordance with the views herein expressed.        *Reversed and remanded.*