Elmer J. Stefany, Individually and as Administrator of the Estate of Julia Roht, Deceased, Henry Stefany, et al., Respondents-Appellants, Anna Benedikova, et al., Additional Respondents-Appellants, v. Henry T. Synek, Petitioner-Appellee.

Gen. No. 49,787.

First District, Third Division.

February 4, 1965.

Theodore D. Kahn and Max & Herman Chill, of Chicago (Max Chill and George D. Karcazes, of counsel), for appellants.

Gregory A. Gelderman and Henry T. Synek, of Chicago (Gregory A. Gelderman and Henry T. Synek, of counsel), for appellee.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

This is an appeal from an order of the Probate Court admitting the will of Julia Roht to probate. At the same time the court revoked letters of administration previously issued to respondent-appellant Elmer J. Stefany, and appointed Henry T. Synek as executor. The court ordered Stefany to turn over the assets of the estate to the executor. From these orders Stefany and the other appellants have appealed.

The last page of the will as submitted by Stefany to the Probate Court was torn, so that the instrument does not contain the names of any attesting witnesses. The will is duly signed and an attestation clause follows, certifying that the will was signed in the pres-

ence of the attesting witnesses who subscribed their names at the request of the testator, and it then continues:

> "[W]e hereby certify that at the time of the execution hereof we believe said Julia Judith Roht . . . Testatrix, to be of sound. . . ."

at which point the will is torn in a jagged line.

The question presented to us is whether the mutilated condition of the will constitutes a revocation in accordance with Section 46 of the Probate Act (Ill Rev Stats c 3, § 46 (1963)), which provides in part as follows:

> "A will may be revoked only (a) by burning, cancelling, tearing, or obliterating it by the testator himself or by some person in his presence and by his direction and consent, (b) by the execution of some other will declaring the revocation, (c) by a later will to the extent that it is inconsistent with the prior will, or (d) by the execution of an instrument in writing declaring the revocation and signed and attested in the manner prescribed in this Article for the signing and attesting of a will. . . ."

The provision under item (a) of the statute, is generally designated as revocation by mutilation and, as later shown, the courts have required that its application be limited to those cases in which the mutilated will was in the possession of the testator at the time of death, and that is the principal issue in the instant case. It is a factual issue and requires an ample statement of the facts.

On April 15, 1962, Julia Roht, then aged 76, went to the hospital with a broken kneecap. The following day the Berwyn Health Department requested her nephew Elmer Stefany to go to her home in Berwyn

because it was filthy and needed cleaning. On that day Stefany brought cleaning material, was let in the house, and then went to visit his aunt at the hospital. On April 17th he again went to his aunt's house. This time his wife was with him. They were admitted by Michael Eiben, Julia Roht's 74 year old brother, who spoke little or no English and who had lived with her since 1923. He had the full run of the bungalow. Brother and sister occupied separate rooms, and there were no locks on any of the doors. Michael died soon afterward, on May 4, 1962. Stefany and his wife cleaned up various parts of the house, putting bags in the pantry and merchandise in drawers. They went into Julia's bedroom to clean up the dresser. In the top drawer, among handkerchiefs, bankbooks, old letters, cards, rosaries, pictures and holy pictures was the will. LaVergne Stefany said, "I think this is a legal document of some sort. What should we do with it?" They opened and glanced at it. She said, "I don't know what we should do. We probably should have legal. . . ." Her husband took the document with him, and they both read it that night. They testified that it was in the same condition when they found it as when they presented it to the Probate Court. The following day Stefany took the will to his lawyer's office. He then took it back to his aunt's house and replaced it in the top dresser drawer where he had found it. He did not tell Julia Roht about finding her will. He said nothing to her about what he had done with it or that he had taken it to a lawyer's office, nor did he advise any of the beneficiaries or the lawyer who had written the will or the executor named therein.

Julia Roht never returned to her home. On May 28, 1962 she was transferred from the hospital to a convalescent home in Berwyn. In July 1962, she was declared incompetent and Elmer J. Stefany was ap-

pointed conservator of her estate. On August 15, 1962, she died in the convalescent home, approximately four months after her will had been found.

On August 28, 1962, Stefany filed a petition for letters of administration. Prior to his appointment as administrator, but without notice to the executor or the beneficiaries named in the will, Stefany presented the will in question to the Probate Court and requested instructions as to its disposition. The court entered an order which characterized the document as "a writing appearing to be an incompleted will or a will revoked by tearing and as such not subject to probate," and directed that it be filed with the clerk of the court. Thereafter, letters of administration were issued to Elmer J. Stefany on September 10, 1962.

On May 29, 1963, eight months after his appointment as administrator, Stefany filed a petition to deny probate of the will, giving notice for the first time to all the legatees listed therein, and to Synek, the executor subsequently named. Answer and petition for admission of the will to probate were thereafter filed by the executor. Thus was created the issue now before us.

At the hearing for probate of the will, Henry T. Synek, his wife Elizabeth, and Leonard Brockman testified in support of the will. The substance of their testimony was that Synek was a lawyer; that he had drawn the will; and that the three of them had witnessed it at Julia Roht's home on January 31, 1948; that in their opinion Julia Roht was of sound mind and disposing disposition; and that the only difference between the will at the time they signed it as witnesses and when it was presented for probate was that the last page had been torn in an irregular manner, so that part of the attestation clause and all the signatures of attesting witnesses had been removed.

Elmer Stefany and his wife testified in opposition to the admission of the will to probate. Their testimony recounted Julia Roht's hospitalization, their discovery of the will, and the events that followed, as hereinbefore set forth. No further testimony was offered. Elmer Stefany as an heir would be entitled to one-fifth of one-third, or one-fifteenth interest in the estate. As administrator he would also receive a fee. The total estate consisted of $36,655 in cash, $27,000 in bonds, and a house worth approximately $18,000, or a gross estate of over $81,000. Under the will, Elmer Stefany was left $1000 and his wife was left $1000 in cash and a diamond ring, the value of which was not shown. There is no doubt that Stefany would benefit substantially if the will were held to have been revoked.

It will aid in the interpretation of the present law relating to revocation by mutilation to examine its history. Under the ecclesiastic courts which controlled passage of personal property by testament and common law courts which controlled passage of real property by will, a set of rules developed with respect to revocation. The basic principle was that the intention of the testator to revoke controlled. It was accordingly held that the *oral* declaration of a testator that he revoked his will or testament operated as revocation. Matthews v. Warner, 4 Ves Jr 186, note; Card v. Grinman, 5 Conn 164; Clark v. Eborn, 6 NC (2 Murph) 234; In re Peirce's Estate, 63 Wash 437, 115 P 835. This recognition of informal revocation by oral declaration resulted in bold attempts to defeat wills by fabricating evidence. This aroused the bar, which urged and obtained the passage of "a law that no written will shall be revoked but by a writing," and this found expression in the Statute of Frauds, 29 Car II CS § 6 (Wills) and § 22 (Testaments) (1677). The

statute of Victoria, passed in 1837, provided that "no will or codicil, or any part thereof, shall be revoked otherwise than as aforesaid [referring to revocation by marriage], or by any will or codicil executed in a manner hereinbefore required, or by some writing declaring an intention to revoke the same, and executed in the manner in which a will is hereinbefore required to be executed, *or by the burning, tearing or otherwise destroying the same by the testator or by some person in his presence and by his direction with the intention of revoking the same.*" 7 Wm IV, W 1 Vic, c 26, § 20 (1837). (Emphasis added.)

■■ Section 46 of the Illinois Probate Act (Ill Rev Stats c 3, § 46 (1963)) hereinbefore quoted, is patterned after these acts and provides methods both of formal and informal revocation. Of the four methods prescribed for revocation, three require written instruments executed by the testator in the formal manner in which wills are required to be executed. Mutilation of a will, like an informal revocation by oral declaration, is more easily accomplished than forgery or other methods of defeating a testator's will. The simple act of tearing, almost impossible to trace, is all that is needed. Therefore, the courts have circumscribed the doctrine of revocation by mutilation with certain conditions, to wit: the mutilated will must have been found in the possession of the testator at the time of his death, and there is no evidence fixing the spoliation on another person. Only if these conditions are fulfilled will the court presume that the mutilation was done by the testator with the intention of cancelling the will. This presumption, however, weighs lightly and may be rebutted by proof of actual facts. Burton v. Wylde, 261 Ill 397, 103 NE 976, cited in In re Will of Barrie, 393 Ill 111, 65 NE2d 433. The presumption applies only if the will was in his possession at the time of his death. In re Will of Barrie,

470

supra; In re Estate of Bakhaus, 410 Ill 578, 102 NE2d 818.

Thus, the issue of possession at the time of death becomes the vital factor in the instant case. On this issue the appellants rely heavily on the case last cited, In re Estate of Bakhaus. There, a harness maker kept his will in a drawer in a desk in his shop, where it was found after his death. His other valuable papers were found in a safe in his bedroom closet. It was shown that the shop was a gathering place for the testator's many customers and friends; that the door was kept unlocked; and that persons other than the testator had access to the shop. It was argued that under these circumstances the will was not in the exclusive possession of the testator. The court held otherwise, however, saying (p 585):

> "[W]e do not feel that the exclusive possession of the testator means that it must be kept under lock and key or in a safety-deposit box."

This conclusion of the court is based on common sense, but it has no application to the case before us. Here, the question is not whether the dresser drawer was a proper place for the keeping of the will, but whether possession in the testator can be said to have continued after it had been broken by the Stefanys' removing the will from the drawer without letting the testator know, and by the other events which followed their discovery of the will.

■ Considering the careful safeguards required by the statute as to other types of revocation, it appears to us that with respect to revocation by mutilation, the possession in the testator at the time of death should be such as to carry assurance that the testator's intention will not be thwarted by the ease with which a will can be mutilated or destroyed; that is to say, that the testator had such possession as does

not normally admit of access or opportunity by others to mutilate or destroy.

It is in this light that we must examine the facts in the case before us. Both Elmer and LaVergne Stefany testified that the will was in their possession for a period before the testator's death and, according to Stefany's own testimony, he took the will from its place of custody to his home and on the following day to his lawyer, who told him to return it to the place from which he had taken it. Stefany returned the will and said nothing about it to the testator. The testator subsequently went from the hospital to a nursing home, where she died, so far as appears, without returning to her home. About four months elapsed from the time the Stefanys found the will and the testator's death. It appears that at no time did the Stefanys inform the testator that they had found her will, that it was mutilated, that they had taken it home and then to a lawyer, or that they had returned it to the place of custody, nor did they inform the testator's lawyer or any of the beneficiaries under the will. Under such circumstances, it would be more accurate to say that it was Stefany, rather than the testator, who had possession of the will.

Respondents-appellants argue that the proponents of the will are in effect accusing the Stefanys of a criminal act, citing In re Estate of Moos, 414 Ill 54, 110 NE2d 194, a lost will situation, in which the court said (p 60):

> "[T]his court has held on numerous occasions that it will not be presumed that a lost will has been destroyed by any other person, without the knowledge of or authority of the testator, even though such person may have had the motive and the opportunity, as that would be presuming a crime (citing cases)."

472

The distinction between that case and the one before us is that here, the proof is definite that another person—one interested in the will—had actually taken possession of it. This is not a finding that Stefany was guilty of any offense, but solely a question of determining whether the requirement that the testator shall have possession and control of the will at the time of death has been met. There are many technical requirements in connection with the signing and attestation of a will which have grown out of experience and are designed to avoid fraud and criminal acts, but their absence does not denote fraud or crime. The revocation of a will by mutilation is in effect carrying out what purports to be a testator's desire or will to have his estate distributed according to the laws relating to intestacy. Possession of the will by the testator at the time of death is a requirement growing out of the experience of courts over many decades, and it should continue as a safeguard against the ease with which a will may be mutilated and the testator's will thwarted. The will was properly admitted to probate.

Judgment affirmed.

DEMPSEY, P. J. and SULLIVAN, J., concur.