PER CURIAM.
Julia Kuhn died in 1971 at the age of 78 having made a will in 1963 subsequent to the death of her husband. Mrs. Kuhn had lived alone for several years prior to her death. A niece, Helen Bakos, and her sister-in-law, Helen E. Bakos, searched Mrs. Kuhn’s home after her death and found a will. The will had been torn into two pieces from top to bottom directly through the signature. The will was found along with other documents in a bureau drawer in the deceased’s bedroom. The will was offered for probate and the trial judge, after hearing extensive testimony, admitted the will to probate even though it had been torn. This appeal is from that order.
The sole question on this appeal is whether there was sufficient evidence before the trial judge to rebut the presumption of revocation created by the fact that the will was apparently revoked pursuant to Fla.Stat. § 731.14(1), F.S.A. The trial judge set forth the applicable law as follows :

“The Court is aware of the provisions contained in Section 731.14(1), Florida Statutes, which provides:
‘A will may be revoked by the testator himself or by some other person in his presence and by his direction, by burning, tearing, canceling, defacing, oblit *277 erating or destroying the same, with the intent and for the purpose of revocation.’
“The Court further recognizes that it is the law of this State that when an alleged Last Will and Testament of a deceased person is found to he in a torn or mutilated condition, that a presumption arises that the Testator tore or mutilated the testamentary writing with the intent to revoke the same. As evidenced by the above quoted statute, the criteria for determining the validity of a torn or mutilated testamentary document is the determination of the intent of the testator evidencing that the purpose of the tearing or mutilation was to revoke the will.” [1]

Although the court’s findings of fact are given verbatim in a footnote,[2] they may be summarized as follows: (1) The appellant, Elizabeth Vargo, was the adopted daughter *278 of Julia Kuhn, deceased, and her husband, John Kuhn, who predeceased Julia. (2) Elizabeth Vargo left the home of her adoptive parents to be married in 1947. There was contact until 1950; thereafter, her adoptive parents moved to Florida. From 1950 to the date of Mrs. Kuhn’s death, there was no personal contact between Elizabeth and her adoptive mother. There was no animosity between Elizabeth and her adoptive mother. (3) Mrs. Kuhn executed a will in 1963 in which she left her entire estate to her niece, Helen Bakos. This was the will which was found in a torn condition. (4) Helen Bakos visited the deceased in her home in Miami. She was the closest person to the deceased. (5) The attorney who represented the decedent testified that Mrs. Kuhn did not inform him of any change in her will or that she had destroyed the will. (6) There was no evidence before the court as to the circumstances of the tearing or as to the intent of the decedent at the time of the tearing. (7) The decedent preserved the torn will, placing it in a bureau drawer along with other important papers.
The trial judge held:

“Based upon the foregoing findings of fact, the Court further finds that the presumption of law has been rebutted and overcome by the evidence before the Court; that there is no showing of factual circumstances, events, intent or desire on the part of the Testatrix that her Last Will and Testament be revoked or that she had any change in her testamentary plan.”

We have carefully examined the record in the light of the conclusions reached by the trial judge and the briefs and the arguments in this cause. We realize that the findings of the trial judge will not be reversed by this court unless they are unsupported by substantial evidence. See In re Yost’s Estate, Fla.App.1960, 117 So.2d 753. In the present instance, we are convinced that there is a total absence of substantial evidence to support the conclusion reached by the trial judge, that is, that the presumption that the deceased destroyed her will for the purpose of revocation was rebutted by proof that at the time of the tearing of the will Mrs. Kuhn had no intention of revoking it. In the first place, there is no evidence at all as to when the will was destroyed, the state of mind of the deceased at that time, or at any time closely approximating the time of destruction. In the second place, there is no evidence as to the intention of the deceased at any time before or after the destruction of the will as to her intention at the time of its destruction. What we have purely and simply is an implication of intention from certain other facts which may or may not be interpreted (according to the view of the interpreter) as indicating what might have been the general state of mind of the decedent during the several years from the death of her husband until her own death. For example, it is urged that because the pieces of the will were kept that this indicates that the tearing may have been accidental, but it might as well be argued that the pieces were kept to show the destruction of the will so that the deceased would not be in the position of a deceased person whose will cannot be found and may be established from a copy thereof. Similarly, some conclusion might be drawn from the fact that the decedent’s adopted daughter did not visit the decedent in Miami. It is urged that this indicated a lack of regard for the adopted daughter, but this fact might equally well be explained by a lack of funds to make a long and expensive trip coupled with the cares in her own home. Without further illustration, we think it is sufficient to say that the evidence before the trial judge was so insubstantial that, even when viewed in the best possible light, it was insufficient to rebut the principle that when a deceased person’s will is found to be torn after being continuously in the deceased person’s possession, a presumption arises that the testator tore the will with the intent to revoke it. Cf. In re *279 Bonner’s Will, 17 N.Y.2d 9, 266 N.Y.S.2d 971, 214 N.E.2d 154 (1966); In re Estate of Riner, 59 Ill.App.2d 434, 207 N.E.2d 487 (1965); King v. Bennett, 215 Ga. 345, 110 S.E.2d 772 (1959); In re Cabler’s Estate, 124 Okl. 275, 257 P. 757 (1927); Burton v. Wylde, 261 Ill. 397, 103 N.E. 976 (1913). See also Silvers v. Estate of Silvers, Fla.App.1973, 274 So.2d 20.
Accordingly, the order appealed is reversed and the cause is remanded with directions to enter an order denying the petition to admit the torn document to probate.
Reversed and remanded.

. There is no challenge on this appeal as to the applicable law. The experienced trial judge is himself an authority on probate law. If additional references are needed, they may be found at 34 Fla.Jur. Wills § 112.

. * * * * *
“The evidenced [sic] presented to the Court has been carefully considered and the Court makes the following findings of fact:
“JULIA KUHN and her husband, JOHN KUHN, were the adoptive parents of ELIZABETH TISZAI. In the adoption papers her name was changed to ELIZABETH KUHN. This adopted daughter is now ELIZABETH VARGO. After her adoption on May 3, 1944, ELIZABETH lived with her adoptive parents for a period of four years, at which time she married. ELIZABETH left her adoptive parents’ home in 1947. The last time she ever saw either of her adoptive parents was on a visit in New Jersey in 1950. Thereafter the parents moved to Florida and there was some correspondence between ELIZABETH and her adoptive father up to the time of his death. At the time of his death, he made no provision by will for any part of his estate to go to his adoptive daughter. From 1950 to the date of MRS. KUHN’S death on December 2, 1971, ELIZABETH had no personal contact with her adoptive mother, received no communication from her and addressed no communications to her. The evidence indicates that there was no animosity or estrangement as between ELIZABETH and her adoptive mother. It was a matter of her getting married, having her own family, and simply drifting apart and in effect severing all family ties after the death of her adoptive father. At the time of the death of the adoptive father, the adoptive mother did not advise ELIZABETH of his death. At the time of the death of the adoptive mother, ELIZABETH received no notification of her death until she received the citation that the Court required as above mentioned.
“On November 27, 1963, MRS. KUHN executed her Last Will and Testament in which she left her entire estate to her niece, HELEN BAKOS. The evidence discloses that HELEN BAKOS visited the decedent in her home in Miami and enjoyed a close relationship with her to the extent that she was the one that the decedent’s next door neighbor, MRS. FARMER, communicated with about the decedent’s condition from time to time. She had lived with MR. and MRS. KUHN in Miami during the years 1961 and 1962, and some time after the death of MR. KUHN, the aunt had asked her to come and live with her in Miami but she was unable to do so because of her sick mother, the sister of MRS. KUHN. It would appear from the entire evidence before the Court that the closest person to the decedent during the last years of her life was the niece, HELEN BAKOS. While there is some implication in the record that the decedent, JULIA KUHN, was not on friendly terms with her sister, the mother of HELEN BAKOS, and some implication that the decedent was unhappy with the niece because she did not come to Florida to live with her when she requested her to do, there is no hard, factual evidence in the record sustaining those implications. The attorney who drew the Will for MRS. KUHN testified that the Will was prepared at her direction and expressed her wishes in 1963. He states that MRS. KUHN never mentioned to him at any time that she ever had an adopted daughter, ELIZABETH VARGOS [sic]. This attorney represented the decedent until the time of her death and at no time after the execution of the Will in 1963 did she ever discuss with him the preparation of a new Will or inform him of any change that she desired to make in her testamentary plan or that she had destroyed the Will that she had previously executed. There is no evidence before the Court as to how the Will became torn or the circumstances of its tearing, or of the intent or desires of the Testatrix at the time of its tearing, but the evidence clearly shows that the Testatrix preserved the torn Will, placing it in her bureau drawer among her valuable papers.”