128 Ill. App.3d 942 (1984)
471 N.E.2d 1018
In re ESTATE OF DENNIS C. DESKINS, Deceased (Diane Bevis, a/k/a Diane Freda, Plaintiff-Appellee,
v.
James Deskins, Defendant-Appellant).
No. 2-83-1021.
Illinois Appellate Court  Second District.
Opinion filed November 28, 1984.
*943 *944 John P. Garrity, of Loftus, Riggs, Redmond & Duff, Ltd., of Addison, for appellant.
William J. Scott, Jr., of Mirabella & Kincaid, of Wheaton, for appellee.
Judgment affirmed.
JUSTICE REINHARD delivered the opinion of the court:
Defendant, James Deskins, appeals from the admission of the will of his son, decedent Dennis C. Deskins, to probate and from the issuance of letters testamentary to plaintiff, Diane Bevis.
Defendant raises the following issues on appeal: (1) whether the trial court erred in admitting the torn will in light of the presumption of revocation; (2) whether, notwithstanding the presumption of revocation, the trial court's decision to admit the will to probate was against the manifest weight of the evidence; (3) whether the trial court erred in admitting the will to probate when the attesting witnesses could not identify the alleged will; (4) whether the trial court erred in disallowing certain testimony as barred by the Dead Man's Act; and (5) whether the trial court erred in disallowing evidence pertaining to decedent's change of beneficiary in certain life insurance policies.
Following the death of decedent, Dennis C. Deskins, on May 4, 1981, decedent's father, defendant James Deskins, filed a petition for letters of administration. Subsequently, plaintiff Diane Bevis (a/k/a Diane Freda), decedent's ex-fiancee, filed a petition for probate of will and for letters testamentary. Both matters were consolidated at the beginning of trial.
At a bench trial, the following evidence was adduced. Testifying for plaintiff, Gary Kraus stated that he was the attorney who drafted the will in issue for decedent in February 1980 and that he kept a photocopy of that document. Kraus also stated that the will was not executed in his presence. Comparing the photocopy with the original, he noticed a difference between them in that the signature lines on the attestation clause of the original will had been cut off. Kraus said he had a telephone conversation with decedent on May 7, 1980, during which decedent told Kraus that a breakup between decedent and plaintiff had occurred and asked Kraus to draft documents whereby decedent would deed his interest in the house to plaintiff in exchange *945 for a release of a promissory note held by plaintiff's father which was for part of the down payment on the house. Kraus reminded decedent that under his will everything would go to plaintiff and suggested that decedent might want to change his will. In September 1980, Kraus had another conversation with decedent during which Kraus asked decedent whether he should draw up a new will, to which decedent replied that he wanted to keep the will that he had. Kraus told decedent if he changed his mind to tear the whole thing up or burn it up, completely destroying it. Kraus said he never told decedent the proper way to revoke the will was to excise the attesting witnesses' signatures from the bottom of the will.
On cross-examination, Kraus testified that in the September 1980 conversation, decedent told him that plaintiff was still a very good friend, that she had taken care of him for several years while he was sick, and that he still wanted the will left as it was. Kraus had also drafted a reciprocal will for plaintiff which left most of her estate to decedent.
Dr. Calvin Kuehner, director of the Basic Science Division of the National College of Chiropractic, testified that he hired decedent as a biologist in the department in 1979. While he could not identify the first page of the will, he recognized the second page because the date of February 19, 1980, was in his handwriting. Kuehner said he saw decedent sign his name to the document and Mrs. Maniglia also witnessed decedent's signature. Kuehner had signed his name below the date. Decedent stated the document was his will and asked Kuehner to witness his signature. Kuehner believed decedent to be of sound mind and memory.
Mary Ann Maniglia, an instructor at the National College of Chiropractic, did not recognize the will shown to her which had the signatures cut off. She did not remember the second page of the will without signatures. She said that sometime around February 1980, decedent asked her to witness his signature, that she did witness it and signed the will, and Dr. Kuehner also witnessed, dated and signed the document. She believed decedent to be of sound mind and memory and said decedent identified the document they signed as his last will and testament.
Diane Bevis, the former Diane Freda, testified that she had been decedent's fiancee and that they had entered into reciprocal wills in February 1980. She replaced her will with a different will in September 1980, by which time the engagement had been broken, and told decedent she was getting a new will. After the engagement was broken on May 3, 1980, she called decedent about five times a week and *946 visited him at his apartment and in the hospital about once a month. Decedent was in the hospital from November 1980 until after Christmas, and plaintiff visited him there. She visited him at his apartment in February 1981 and then, after decedent was hospitalized again in March 1981, she periodically visited him in the hospital. Decedent died in the hospital on May 4, 1981. At decedent's funeral on May 8, 1981, defendant showed her decedent's will and she saw the second page was cut. Prior to May 8, 1981, the last time she saw decedent's will was May 1980, at which time it contained signatures and was complete.
Defendant, testifying as an adverse witness, stated that decedent, his son, passed away at the age of 28 on May 4, 1981, from Hodgkin's disease. Prior to his death, decedent had been in the hospital for one month, during which time defendant would drive down from his home in Troy, Michigan, and visit decedent in the hospital. When visiting, defendant and his wife, when she came along, would stay at decedent's apartment. Defendant would pick up the key at the hospital and return it when he left. To his knowledge, no one other than he and his wife stayed at decedent's apartment during the last month. Defendant stated that a friend of decedent's had access to the apartment to water the plants and bring in the mail. Defendant showed the will to plaintiff at the decedent's funeral.
Dr. Faye O'Brien Usala testified that she taught with decedent beginning in April 1980 and knew him until his death. In November 1980, she had a conversation with decedent regarding his will in which he told her he had a life insurance policy with plaintiff named as the beneficiary. Plaintiff objected to testimony about the change of insurance beneficiary on the basis of relevancy. The trial court permitted the witness to answer, reserving ruling on its relevancy to see if defendant could later tie up intent to change the insurance beneficiary with intent to revoke the will. Usala said decedent told her that plaintiff was named as receiver of decedent's estate under the will and that Dr. Kuehner and Mrs. Maniglia were the witnesses. Decedent told her that he wanted the beneficiary on the will changed because he felt his parents should get any money that was left after he died because they helped him with his financial responsibilities and with their emotional support. She testified that decedent said he wanted to change the will and the insurance so that any money left after his medical bills were paid went to his parents. During that November 1980 conversation, decedent was depressed, lonesome, and hurt because his relationship with plaintiff had ended, and he felt since plaintiff wanted the relationship ended, he should not leave her as beneficiary *947 under his insurance or his will.
In February or March 1981, Usala had another conversation with decedent at his apartment during which decedent said he wanted to change the will so that his parents would get the money after all the medical bills were paid. Usala said she never saw the will until after decedent died, when defendant showed it to her while he and his wife were cleaning decedent's apartment. She noted that the will was in the same condition then as it was on the day of trial in that it was ripped on the bottom part. On cross-examination, Usala admitted that she had had a key to decedent's apartment.
Edmundo Wong, accountant and office manager at the National College of Chiropractic, testified that he handled the insurance at the time decedent was a faculty member at the college, and that decedent executed a change of beneficiary request on a life insurance policy on September 28, 1980, which changed the beneficiary from Diane Freda to the estate of Dennis Deskins. The change-of-beneficiary card itself was not admitted into evidence, based on the trial court's ruling that it was irrelevant in that only decedent's intent as to the will itself was at issue.
Defendant testified that in November 1980, decedent became ill and was hospitalized until January 1981, and defendant was there almost every weekend. There were periods when defendant would stay a week or 10 days at a time. Decedent was hospitalized for one- or-two-day periods off and on and then hospitalized for the last long term beginning on April 4, 1981. Defendant said he first saw the will between January 10, 1981, and February 11, 1981, while staying with decedent, and that the will looked then as it did at trial, with the second page being only a portion of a page.
Counsel asked defendant if he had any conversation with decedent regarding the will. An objection to the question was sustained on the basis of the Dead Man's Act.
Defendant further testified that he subsequently saw the will several times during the February-March time frame of 1981 lying on top of decedent's desk, while decedent's other papers were in a metal cabinet. From April 4 to May 4, 1981, defendant visited decedent during weekends, whenever he could, and had access to decedent's apartment. Defendant found the will, still lying on top of decedent's desk, the day after decedent died, and removed it along with decedent's personal effects, bankbook, cash, insurance policies, and change-of-beneficiary notice dated May 1980.
Commenting on the relevancy of the evidence concerning change of insurance beneficiary, the trial court at the close of trial made no *948 definite ruling on the admission of this evidence except to state that "[t]here is no jury here, so it doesn't make that much difference really." The court asked the parties to submit post-trial memoranda on the evidence, which also apparently included the relevancy question as it was addressed briefly in the memoranda filed by the parties. Subsequently, the trial court issued a memorandum to the parties in which it found that the facts of Stefany v. Synek (1965), 55 Ill. App.2d 464, 205 N.E.2d 265, were nearly identical to those of the instant case; that defendant discovered the will in its mutilated condition months before decedent's death but never informed anyone of the discovery until after decedent died; that decedent had been instructed as to how to revoke the will, and the mere tearing of the attestation clause was contrary to those instructions; that decedent was expressly asked if he wished to change his will, but he stated he did not want to change it; that, based on these observations, it appeared that possession of the will was in defendant at the time of death; that the conditions for revocation of a will were not present; and admitted the will to probate. The court did not comment or rule on the relevancy of the change of life insurance beneficiary.
 1, 2 Defendant first contends that the will was improperly admitted to probate because plaintiff failed to present evidence to overcome the presumption of revocation which, he claims, was established by the cutting of the second page and by decedent's exclusive possession of the will. Generally, where a will remains in the testator's possession until his death and is then found among his papers with erasures, alterations, cancellations or tearings, the presumption is that such act, manifest upon the will, was done by the testator with the intention of revoking it. (In re Will of Barrie (1946), 393 Ill. 111, 119, 65 N.E.2d 433; Burton v. Wylde (1913), 261 Ill. 397, 399-400, 103 N.E. 976.) No act of tearing or cutting is effective, however, unless there is an intent to revoke the will. (In re Estate of Bakhaus (1951), 410 Ill. 578, 583, 102 N.E.2d 818; Fleming v. Fleming (1937), 367 Ill. 97, 101, 10 N.E.2d 641.) The intent may be inferred from the nature of the act, the condition of the instrument, or by extrinsic evidence, but it must, in some competent way, be made to appear. Fleming v. Fleming (1937), 367 Ill. 97, 101, 10 N.E.2d 641.
 3 The Probate Act outlines the methods of revocation of wills.
"A will may be revoked only (1) by burning, cancelling, tearing or obliterating it by the testator himself or by some person in his presence and by his direction and consent, (2) by the execution of a later will declaring the revocation, (3) by a later will to the extent that it is inconsistent with the prior will or (4) by *949 the execution of an instrument declaring the revocation and signed and attested in the manner prescribed by this Article for the signing and attestation of a will." (Ill. Rev. Stat. 1981, ch. 110 1/2, par. 4-7(a).)
"Tearing," as used in this provision, includes cutting, and need not be a cutting of the entire will. (Fleming v. Fleming (1937), 367 Ill. 97, 100, 10 N.E.2d 641; Burton v. Wylde (1913), 261 Ill. 397, 402, 103 N.E. 976.) The excision of the names of the attesting witnesses constitutes a tearing within the meaning of the statute (see Stefany v. Synek (1965), 55 Ill. App.2d 464, 472, 205 N.E.2d 265), and thus the first requirement for the establishment of the presumption has been met.
The trial court held that the second requirement, that decedent have possession and control of the will at the time of his death, had not been met, finding that defendant had possession at the time of decedent's death. "[W]ith respect to revocation by mutilation, the possession in the testator at the time of death should be such as to carry assurance that the testator's intention will not be thwarted by the ease with which a will can be mutilated or destroyed; that is to say, that the testator had such possession as does not normally admit of access or opportunity by others to mutilate or destroy." Stefany v. Synek (1965), 55 Ill. App.2d 464, 471-72, 205 N.E.2d 265.
What is necessary to show possession turns on the facts of each case. In In re Estate of Bakhaus (1951), 410 Ill. 578, 102 N.E.2d 818, where the will had been kept in a drawer in testator's harness shop with other business papers, while his other valuable papers were in a safe in his bedroom closet, it was held that the will was in the exclusive possession of the testator. Likewise, in In re Estate of Riner (1965), 59 Ill. App.2d 434, 207 N.E.2d 487, on which defendant principally relies, where the will, along with business papers, had been kept in a drawer in a house testator shared with his niece and had been found there in a torn condition by the niece and an acquaintance following testator's death, the court found the presumption of revocation was raised. In contrast, in Stefany v. Synek (1965), 55 Ill. App.2d 464, 205 N.E.2d 265, the facts of which the trial court found nearly identical to those of the instant case, decedent was hospitalized and her nephew and his wife found a will, which had the names of the attesting witnesses torn off, while cleaning decedent's home. They took it home, read it, took it to a lawyer, and returned it to where it had been found without telling decedent. Decedent died in a convalescent home, never returning to her home. The appellate court found that under these circumstances, the nephew, rather than decedent, *950 had possession of the will. 55 Ill. App.2d 464, 472, 205 N.E.2d 265.
 4 Turning to the facts of the instant case, we note first that the will was located on top of decedent's desk after his death, while his other important papers were kept in a metal cabinet. Decedent's father, who stood to gain if the will was revoked, had access to decedent's apartment during the month-long hospitalization immediately before decedent's death. Dr. Usala, a friend and co-worker, also had a key to the apartment. Defendant admitted staying periodically in decedent's apartment while decedent was in the hospital during that time frame, and decedent never again returned to his apartment. Defendant was the only person to testify to seeing, prior to decedent's death, the second page of the will in its mutilated condition. Defendant further testified that he saw the will lying on top of the desk on several occasions during the February-March 1981 period while he was at decedent's apartment.
Under these particular circumstances, we do not believe possession of control of the will was in the decedent-testator until his death to the exclusion of someone who may have an interest in the revocation of the will. Defendant, who stood to gain by mutilation of the will, and who periodically stayed in decedent's apartment during the month-long time decedent was in the hospital immediately prior to his death, had such access or opportunity to multilate the will while it was lying in plain view on the desk top that possession of the will was not in the decedent to order to invoke the presumption of revocation of the will. Based on this evidence, we do not believe the trial court's conclusion that the will was not in decedent's possession was erroneous.
Defendant next argues that even if the presumption of revocation is inapplicable, the trial court's ruling that the will was not revoked was against the manifest weight of the evidence. A review of the evidence discloses that although the attorney who drafted the will told decedent that the proper way to revoke the will was to burn or tear it completely, the will was found, contrary to those instructions, with the names of the attesting witnesses cut off. The attorney had on two occasions reminded decedent that the will left almost everything to plaintiff and asked decedent if, because the engagement had been broken, he wanted the attorney to draw up a new will, but decedent replied that he wanted to keep the will that he had because plaintiff was still a very good friend and had taken care of him for several years while he was sick. Plaintiff remained in close contact with decedent until his death, calling him five times a week and visiting him once a month. Evidence which shows the testator maintained an attitude of *951 friendship toward proponents of the will up to the time of his death has been held to reflect the attitude of a testator which makes it unlikely that he would have revoked a will benefiting those with whom he continued to have good relations. (See In re Estate of Moos (1953), 414 Ill. 54, 60-61, 110 N.E.2d 194; In re Estate of Babcock (1983), 119 Ill. App.3d 482, 489-90, 456 N.E.2d 671, appeal allowed (1984), 96 Ill.2d 567 (cases which deal with the presumption of revocation where the will cannot be found).) While it is evident that decedent expressed thoughts about changing his will and its presence on top of his desk indicates such, it is also shown that decedent told his attorney that he wanted to keep the present will and remained a good friend of plaintiff.
 5 Some of the testimony was conflicting, in that while defendant testified that he saw the will with the second page cut between January 10, 1981, and February 11, 1981, Dr. Usala stated that in a February or March 1981 conversation, decedent told her he wanted to change the will, implying that he had not as yet done so. Defendant stated that he found the will the day after decedent's death, in the presence of his other son, David, and, because he believed things should not be left in an unattended apartment, took it, along with other important papers, back to Michigan. Dr. Usala testified that she saw the will in decedent's apartment a week or two after his death when decedent's parents were cleaning his apartment, so that there is a conflict in testimony as to when the will was actually discovered and removed. We recognize that, especially where the testimony is contradictory, the trial judge as trier of fact is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence, and where, as here, we believe the trial court's finding is not against the manifest weight of the evidence, we will not disturb it. Nibco, Inc. v. Johnson (1983), 98 Ill.2d 166, 173-74, 456 N.E.2d 120.
 6 Defendant claims that because the attestation signatures had been cut off, plaintiff attempted to prove the will by testimony, pursuant to section 6-4 of the Probate Act of 1975 (Ill. Rev. Stat. 1981, ch. 110 1/2, par. 6-4), but that the testimony failed because the attesting witnesses were unable to identify specifically the will. Defendant has not cited to us any cases in support of his argument. The statute states:
"When each of 2 attesting witnesses to a will states that (1) he was present and saw the testator or some person in his presence and by his direction sign the will in the presence of the witness or the testator acknowledged it to the witness as his *952 act, (2) the will was attested by the witness in the presence of the testator and (3) he believed the testator to be of sound mind and memory at the time of signing or acknowledging the will, the execution of the will is sufficiently proved to admit it to probate, unless there is proof of fraud, forgery, compulsion or other improper conduct which in the opinion of the court is deemed sufficient to invalidate or destroy the will." (Ill. Rev. Stat. 1981, ch. 110 1/2, par. 6-4(a).)
Both witnesses to the will sought to be admitted attested to decedent's sound mind and memory and stated that they saw decedent sign the will and that they signed the will, thus fulfilling the statutory requirements. Dr. Kuehner recognized that the date on the will was in his handwriting, and he and Mrs. Maniglia each testified that they saw the other sign it. Dr. Usala testified that decedent told her that Kuehner and Maniglia were witnesses to the will and plaintiff was the beneficiary. Attorney Gary Kraus identified the will as the one he drafted for decedent, except that the signature lines on the attestation clause had been cut off. Thus, the requirements of the statute regarding execution of the will were met, and the proofs were sufficient to show that the will sought to be admitted was the will attested to by the witnesses. Under these circumstances, we conclude that the trial court properly admitted the will to probate even though the witnesses to it could not definitely identify it as the will decedent signed.
 7 Defendant's next contention is that the trial court, relying on the Dead Man's Act, improperly prohibited defendant, as a party in interest, from testifying as to a conversation he had with decedent regarding the will. Defendant maintains that the Act was inapplicable because the testimony would have been such that decedent could not refute it and because plaintiff had "opened the door" by calling defendant as an adverse witness.
The Dead Man's Act (Ill. Rev. Stat. 1981, ch. 110, par. 8-201) renders incompetent the testimony from an interested person concerning conversations and events taking place in the presence of the deceased person. (Manning v. Mock (1983), 119 Ill. App.3d 788, 800, 457 N.E.2d 447.) Defendant argues that decedent evidenced an intent to revoke, based on the change of beneficiary on his life insurance policies, which decedent, if alive, could not refute. However, decedent, if alive, obviously could refute that he had intended to revoke the will, a question separate from the change of beneficiary on his life insurance policies.
 8 Although defendant had been called by plaintiff as an adverse witness, the conversation about which defendant wished to testify was *953 not a subject opened up by plaintiff during her section 2-1102 examination. Defendant claims all of his testimony was "part of the same transaction," so as to fall within an exception to the Dead Man's Act which provides:
"If any person testifies on behalf of the representative to any conversation with the deceased or person under legal disability or to any event which took place in the presence of the deceased or person under legal disability, any adverse party or interested person, if otherwise competent, may testify concerning the same conversation or event." (Ill. Rev. Stat. 1981, ch. 110, par. 8-201(a).)
The words "same conversation or event," when given their plain and ordinary meaning (see Schutzenhofer v. Granite City Steel Co. (1982), 93 Ill.2d 208, 211-12, 443 N.E.2d 563), are not as encompassing as defendant contends, for, under his interpretation, any fact regarding the will would be subject to the exception to the Act. (See Manning v. Mock (1983), 119 Ill. App.3d 788, 799, 457 N.E.2d 447.) Defendant was examined pursuant to section 2-1102 only generally as to the dates of decedent's hospitalization, the defendant's access to decedent's apartment, and defendant's showing of the will to plaintiff at the funeral. Although a party who is incompetent to testify for himself as to a transaction, if called as an adverse witness and questioned concerning the same, is competent to testify on his own behalf as to the whole of the transaction, the incompetency is not removed on other matters about which he was not interrogated by the adverse party. (Perkins v. Brown (1948), 400 Ill. 490, 497, 81 N.E.2d 207.) Here, the disputed conversation sought to be introduced clearly does not fall within the exception to the Dead Man's Act and was properly excluded.
 9 Defendant next contends that the trial court erred in disallowing relevant evidence pertaining to the decedent's change of beneficiary in certain life insurance policies, which comprised most of his estate, from plaintiff to his estate. From our examination of the court's comments on this point, it is not entirely clear whether the court excluded all of this evidence or just the change-of-beneficiary card sought to be introduced into evidence. The court below commented at one point that, as this was not a jury trial, admission of this evidence did not make that much difference. Thus, it would appear that the trial court considered at least part of this type of evidence, but gave little weight to the evidence.
In any event, even assuming the evidence was excluded and it was error to do so, we are not persuaded this was prejudicial under *954 the evidence here. The change of beneficiary on the life insurance policies was made to be consistent with that of his estate. The plaintiff was the beneficiary of the estate under the will. While it is apparent from some of the evidence that decedent expressed thoughts about changing his will, other evidence, as discussed above, was that he wanted to keep the will that he had attorney Kraus prepare. Had decedent wished to exclude plaintiff from the bulk of his estate, which was the insurance proceeds, he could have made his parents the beneficiaries when he, instead, made the estate the beneficiary. The most the change of beneficiary evidence shows is that decedent during his terminal illness was concerned with who would be the beneficiary of his estate. Other probative evidence indicating this concern was in evidence. No prejudicial error resulted from exclusion of this evidence if, in fact, it was excluded in its entirety.
For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.
Affirmed.
SCHNAKE and LINDBERG, JJ., concur.